In re F.A. POTTS AND CO.,
INC., Debtor.

McCORMACK TERMINAL COMPANY,
INC., Plaintiff and Counterdefendant,

v.

F.A. POTTS AND CO., INC., Defendant
and Counterclaimant,

and

Korea Shipping Corporation, Defendant.

Bankruptcy No. 81–03639T.

Adv. No. 82–1467.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 27, 1984.

David L. Braverman, Wexler, Weisman, Forman & Shapiro, Philadelphia, Pa., for F.A. Potts and Co., Inc.

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for McCormack Terminal Co., Inc.

John K. Fiorilla, Philadelphia, Pa., for Consol. Rail Corp.

George J. Koelzer, Red Bank, N.J., for Korea Shipping Corp.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

The plaintiff, McCormack Terminal Company, Inc. ("McCormack"), commenced this adversary proceeding on June 11, 1982 by filing a Complaint against F.A. Potts and Co., Inc. ("Potts"), a Chapter 11 debtor which filed its bankruptcy petition on September 11, 1981, and Korea Shipping Corporation.[1] The gravamen of the Complaint is that Potts defaulted under an Agreement between Potts and McCormack and that, as a result of said default, Potts is indebted to McCormack in an amount in excess of $14,000,000.00. McCormack had previously filed a proof of claim against Potts in that amount and requests in the Complaint that its proof of claim be allowed. McCormack further requests in the Complaint that the Court determine how much of McCormack's claim is secured and how much is unsecured. McCormack alleges, however, that only a very small portion of its claim is secured.

Potts denies any liability to McCormack and has filed a Counterclaim. Potts' Counterclaim alleges, *inter alia*, that McCormack breached the Agreement and that Potts is entitled to damages from McCormack in excess of $4,000,000.00.

For the reasons hereinafter given, we find that McCormack breached the Agreement between the parties and shall deny all of the relief requested in McCormack's Complaint. Furthermore, we shall grant, in part, the relief requested by Potts in its Counterclaim.

This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Bankruptcy Rules.

## I. McCORMACK'S CLAIM AGAINST POTTS

### A. *The Parties, Their Agreement, And The Parties' Interpretation Thereof*

McCormack is a corporation organized and existing under the laws of the state of

1. Korea Shipping Corporation did not participate in this proceeding and, in view of our resolution of this proceeding, is subject to no liability and is not relevant herein.

New Jersey, with its principal place of business located in Princeton, New Jersey. McCormack, through certain affiliated entities, is the owner and operator of a rail and water terminal facility (the "Terminal") located in South Amboy, New Jersey.

Potts is a corporation organized and existing under the laws of the state of New York, with its principal place of business located in Pottsville, Pennsylvania. Potts is engaged in the business of buying and selling coal and related materials.

The central controversy in McCormack's claim against Potts involves the proper interpretation of the Agreement of December 23, 1980 between the parties, particularly Potts' payment obligations under the Agreement. Therefore, we shall set forth the relevant provisions of the Agreement and then describe the parties' disagreement over the interpretation of the Agreement.

In general, the Agreement provided that, in return for certain payments made by Potts to McCormack, Potts was granted exclusive use of the Terminal for five years beginning on April 1, 1981 and McCormack was to perform various services regarding the product[2] shipped by Potts to the Terminal. Such services included unloading the product from railcars at specified rates, storing it at the Terminal, and loading it onto barges at specified rates.

Paragraph 5 of the Agreement was entitled "Barges and Tugs". It provided that the barging of the product from the Terminal to the shipside of the ocean-going vessels was one of the services for which McCormack was responsible. Paragraph 5 further provided: "The barge and tug owners shall bill MTC[3], which shall pay such bills when due.... As consideration for the service performed by MTC pursuant to this paragraph 5, MTC shall be promptly reimbursed [by Potts] at its cost plus 10% for services rendered." These paragraph 5 services have been consistently referred to by the parties and the Court throughout this proceeding as "marine services".

Paragraph 6 of the Agreement stated in its entirety:

6. *Payments.* In consideration of the services to be rendered by MTC as above, Potts will pay MTC:

(a) $250,000 upon signing of this Agreement by both parties.

(b) $250,000 by May 1, 1981 and on or before the first day of each month thereafter through the duration of this Agreement.

(c) MTC shall credit Potts in the full amount of payments received as above, and shall bill against that credit periodically as services are rendered on the following basis:

(i) Two dollars ($2.00) per ton for product unloaded from railroad cars at the terminal site.

(ii) One dollar ($1.00) per ton for product loaded into barges at the dock side of the terminal site.

(iii) Amounts due pursuant to paragraph five (5) hereof.

(iv) As of April 1, 1982 and each year thereafter, three dollars ($3.00) per ton for each ton, if any, whereby the total tonnage of product delivered by Potts to the terminal during the preceding 12 months was less than 1,000,000 tons.

(d) The amount of excess (if any) of such billings (figured on the basis stated above) over the then credit for Potts referred to above, on or before the 10th day following billing for any month in which such excess (if any) arose.

The monetary figures stated in paragraph 6(b) and (c) were subject to cost-of-living adjustments every six months, according to paragraph 7 of the Agreement. Beginning on July 1, 1981, the paragraph 6(b) payment obligation increased from $250,000 to $256,665.

Paragraph 11, entitled "Force Majeure", essentially provided that either party's obligations under the Agreement were to be

---

**2.** Under the Agreement, "product" is defined as "anthracite coal, bituminous coal and/or coke."

**3.** McCormack is referred to as "MTC" in the Agreement.

suspended during any period of time in which the party's performance was prevented by several enumerated causes as well as any other cause not within the control of the party. One of the enumerated causes was "strikes".

Paragraph 12, entitled "Default", stated, in part:

> If Potts fails to make any payment called for above within ten (10) days after same is due, MTC shall notify Potts of nonpayment and Potts thereafter shall pay the overdue sum(s) within the next seven (7) days after receipt of this notice. If Potts fails to do so it shall be in default....

Paragraph 13 was the integration clause of the Agreement and stated in its entirety:

> This Agreement constitutes the entire understanding and agreement of the parties regarding handling and storage of the product. It shall not be modified except in writing signed by an authorized person for each party.

As indicated *supra*, the crux of this case involves the proper interpretation of Potts' payment obligations under the Agreement. As will be seen *infra*, this question is central to our determination as to whether or not Potts had defaulted under the Agreement.

McCormack contends that charges for paragraph 5 marine services were to be paid independently of and in addition to the paragraph 6(a) and (b) payments, with the result that the marine services charges could not be offset against Potts' paragraph 6(a) and (b) payments.[4] Thus, according to McCormack's interpretation, for every month from May, 1981 onward, Potts was obligated to pay $250,000 (increased to $256,665.00 as of July, 1981) plus any marine services charges for that month.

Potts contends, to the contrary, that charges for marine services were not to be paid independently of and in addition to the paragraph 6(a) and (b) payments. Rather, the marine services charges, like the throughput charges, were to be offset against the paragraph 6(a) and (b) payments. Thus, according to Potts' interpretation, for every month from May, 1981 onward, Potts was obligated to pay only the paragraph 6(b) monthly payment unless the charges for throughput services and/or marine services were high enough for a particular month to obligate Potts to make an additional payment for that month pursuant to paragraph 6(d).[5]

### B. *The Agreement In Operation*

The parties operated under the Agreement from December 23, 1980, when it was signed, until September 8, 1981, when McCormack terminated the Agreement for Potts' alleged default under the Agreement.

During the operation of the Agreement, Potts shipped over 200,000 tons of product to the Terminal. Six ocean-going vessels were loaded with this product for shipment to Potts' overseas customers.

McCormack invoiced Potts for the marine services it performed at its cost plus 10% pursuant to paragraph 5. McCormack also invoiced Potts for McCormack's throughput services pursuant to paragraph 6(c)(i) and (c)(ii). As of September 8, 1981, McCormack had invoiced Potts for $680,916.52 for marine services and $501,736.02 for throughput services, resulting in total invoiced services of $1,182,652.54.

The parties have stipulated that, pursuant to the Agreement, the total of the payments made by (or on behalf of) Potts to McCormack was $1,839,963.53. The following dates and amounts of the payments have also been stipulated to:

| | |
|---|---|
| January 18, 1981 | $100,000.00 |
| May 4, 1981 | $75,000.00 |
| June 2, 1981 | $325,000.00 |

---

**4.** It is undisputed that the charges for McCormack's unloading and loading services ("throughput" services) could be offset against Potts' paragraph 6(a) and (b) payments. See paragraph 6(c)(i) and (c)(ii).

**5.** It is undisputed that during the life of the Agreement, Potts never became obligated to make any payments to McCormack pursuant to paragraph 6(d).

| June 16, 1981 | $475,000.00 |
|---|---|
| July 15, 1981 | $250,000.00 |
| July 22, 1981 | $300,000.00 |
| August 24, 1981 | $314,963.53 |
| TOTAL: | $1,839,963.53 |

As is evident from the above list of payments, Potts' payments were sporadic and of varying amounts. Potts was experiencing financial difficulties throughout the duration of the Agreement, including a persistent shortage of cash. Therefore, Potts and McCormack several times agreed upon a payment system whereby, in essence, McCormack received its payments out of the proceeds that Potts was to receive from its customers for the sale of its product shipped through the Terminal. This payment system resulted in the irregular payments shown above.

During the course of the Agreement, McCormack frequently claimed that Potts was not complying with its payment obligations pursuant to the Agreement and sent to Potts several notices of non-payment. While conceding certain delays in payments due to various reasons, including its aforementioned financial difficulties, Potts claims that it is entitled to some relief from its payment obligations because of the United Mine Workers' strike, which lasted from approximately March 27, 1981 until approximately June 11, 1981. Potts contends that this strike and its effect on Potts' business qualifies Potts for relief pursuant to the force majeure provisions of paragraph 11 of the Agreement.[6]

McCormack's claim that it lawfully terminated the Agreement on September 8, 1981 because of Potts' default and material breach of the Agreement is grounded upon McCormack's August 12, 1981 telex to Potts, which Potts received on the same date. In that telex, McCormack stated that Potts had failed to pay the following sums due McCormack: $263,330.00 pursuant to paragraph 6(b) and $126,483.69 for marine

services. The $263,330.00 was comprised of the $256,665.00 payment due on August 1, 1981 and $6,665.00 still due from July, 1981, when the paragraph 6(b) payment obligation was increased from $250,000.00 to $256,665.00 due to the cost-of-living adjustment. Potts did not make any payments to McCormack from August 12, 1981 through August 19, 1981. McCormack contends that Potts' failure to pay the allegedly overdue sums within this seven day period constituted a default by Potts under paragraph 12 of the Agreement, *supra*, and entitled McCormack to lawfully terminate the Agreement at any time after August 19, 1981. McCormack further contends that the payment of $314,963.53 on August 24, 1981 (which was made by a third party on behalf of Potts) did not cure Potts' default because it was untimely and failed to satisfy in full Potts' debt for marine services.[7] As of September 8, 1981, McCormack contends that Potts owed to it $256,665.00 for the paragraph 6(b) payment due on September 1, 1981 and $104,282.99 for marine services. As discussed *infra*, Potts disputes that it was in default as of August 19, 1981 or at any time thereafter.

### C. Discussion

In order to put this controversy into the proper perspective, we shall first describe the status of the Potts-McCormack account, as of September 8, 1981, according to each party's aforementioned interpretation of Potts' payment obligations pursuant to the Agreement.

According to McCormack's interpretation, as of September 8, 1981 (and including the paragraph 6(b) payment of $256,665.00 due on September 1, 1981), Potts was obligated to have paid $1,519,995.00 pursuant to paragraph 6(a) and (b) and $680,916.52 for marine services, for a total of $2,200,-911.52. In that Potts had paid only $1,839,-963.53 as of September 8, 1981, Potts owed

6. However, the question of whether or not Potts is entitled to any payment relief becomes moot in light of our ultimate resolution of this case.

7. Whenever Potts made a payment to McCormack, McCormack allocated the payment first

to any amounts allegedly due pursuant to paragraph 6(a) and (b). Then, if the payment fully satisfied this obligation, any remainder would be allocated to amounts allegedly due for marine services.

$360,947.99 as of that date: $256,665.00 for the September monthly payment and $104,282.99 for marine services.

According to Potts' interpretation, as of September 8, 1981, even assuming that the September, 1981 payment is included as an obligation and that Potts is not entitled to any relief from its payment obligations, Potts' total payment obligation was only the paragraph 6(a) and (b) obligation, which totalled $1,519,995.00.[8] In that Potts had paid $1,839,963.53, Potts claims that it actually had overpaid McCormack in the amount of at least $319,968.53 as of September 8, 1981.[9] Given the parties' differing interpretations, it is, of course, no coincidence that $680,916.52 (total invoiced marine services charges) is the exact sum of $360,947.99 (amount which McCormack claims Potts owed) and $319,968.53 (amount which Potts claims it overpaid).

We also note that, according to Potts' interpretation, Potts had clearly overpaid McCormack during any and all of August, 1981, thus making invalid McCormack's aforementioned notice of non-payment telex of August 12, 1981 as well as any allegations of Potts' default thereafter.

In determining the critical question of Potts' marine services payment obligation, we begin by setting forth each party's construction of the language of the Agreement itself on this question.

Potts contends that the language of the Agreement is clear and unambiguous regarding this question. According to Potts, paragraph 6 of the Agreement is simple and explicit. In particular, paragraph 6(c)(iii) expressly and plainly provides that the paragraph 5 marine services charges are to be offset against the paragraph 6(a) and (b) payments.

The thrust of McCormack's argument is that the language of the Agreement is ambiguous and that, based upon this ambiguity, the Court should admit and consider extrinsic evidence regarding this question.[10] According to McCormack, the phrase "as above" in paragraph 6(c) regarding payments received can and should, under general principles of draftsmanship, be construed as encompassing all previous paragraphs of the Agreement, and not only paragraph 6(a) and (b). McCormack claims that Potts has an independent payment obligation under paragraph 5. Thus, the phrase "payments received as above" in paragraph 6(c) includes payments made pursuant to paragraph 5. Therefore, under paragraph 6(c), Potts would be credited with paragraph 5 payments as well as paragraph 6(a) and (b) payments. With regard to paragraph 6(c)(iii), "McCormack contends that paragraph 6(c)(iii) required McCormack to bill Potts for the amounts due pursuant to paragraph 5, and to record these bills against the credits for the payments made by Potts pursuant to paragraph 5." McCormack Reply Brief, p. 13. McCormack also points out that paragraph 6(c)(iv) required, on an annual basis, that the paragraph 6(b) payments be totally offset by the throughput charges of paragraph 6(c)(i) and (c)(ii). McCormack argues that this total annual offset "necessarily compels the conclusion that the contract required Potts to pay the marine charges in addition to making the minimum monthly payments." McCormack Reply Brief, p. 12. Based upon all of the foregoing, McCormack contends that the language of the Agreement unambiguously supports its position on Potts' marine services payment obligation or, at the least, is ambiguous on this question.

As a rejoinder to McCormack's contentions, Potts argues that paragraph 6(c)(iii) would be meaningless under McCormack's interpretation.

---

**8.** McCormack does not contend that Potts ever owed any money to McCormack pursuant to either paragraph 6(c)(iv) or (d) of the Agreement.

**9.** As will be discussed with regard to Potts' Counterclaim, *infra*, Potts claims that it is entitled to a refund from McCormack well in excess of $319,968.53.

**10.** McCormack also contends that the language of the Agreement unambiguously supports its position.

Potts also disputes McCormack's interpretation of the phrase "payments received as above" in paragraph 6(c). First, Potts states correctly, and as conceded by McCormack, that the phrase "as above" was not always used in the Agreement to encompass all previous paragraphs. For example, the phrase "as above" in paragraph 11 clearly refers only to the preceding sentences in paragraph 11 and not to any preceding paragraphs of the Agreement. More importantly, argues Potts, "payments received as above" cannot refer to paragraph 5 because nowhere in paragraph 5 is there any reference to a "payment" by Potts. Furthermore, in the entire Agreement, there is not a single reference to a "payment" under paragraph 5. The only cross-reference to paragraph 5 in the Agreement is in paragraph 6(c)(iii) which speaks of amounts, not payments, due pursuant to paragraph 5. Potts also notes that paragraph 6 is entitled "Payments", whereas paragraph 5 is entitled "Barges and Tugs". In addition, the only references prior to paragraph 6(c) to a payment by Potts to McCormack are in paragraph 6(a) and (b).

For reasons which we shall discuss *infra*, if the only evidence that we decide to consider is the language of the Agreement itself, we would rule in Potts' favor regarding its marine services payment obligation. However, a major issue presented in this case has been whether or not we may also properly consider evidence regarding the parties' pre-Agreement negotiations and understanding on this question. During the trial, McCormack presented a great deal of evidence, both documentary and testimonial, regarding the parties pre-Agreement negotiations and understandings, including prior drafts of the Agreement. McCormack asserted that this evidence was relevant to our interpretation of Potts' marine services payment obligation under the Agreement. Potts consistently objected to the admission of this evidence, contending that it was irrelevant pursuant to the parol evidence rule,[11] inasmuch as the Agreement is integrated as well as unambiguous on this question. We provisionally admitted the evidence over Potts' objections subject to our final determination.

On this parol evidence issue, McCormack submits that the interpretations of the parol evidence rule by the Courts of Pennsylvania and the Courts of New Jersey are markedly different. As applied to our case, claims McCormack, the difference is such that our choice as to which interpretation to follow may very well have a significant effect on the outcome of the case, thereby triggering the application of the choice of law rules of Pennsylvania, the forum state. See *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.,* 584 F.2d 1306 (3rd Cir.1978). McCormack then contends that according to Pennsylvania's choice of law rules, the law of New Jersey should be applied to this substantive parol evidence issue because New Jersey has a greater interest in having its laws followed in this litigation than does Pennsylvania and because New Jersey possesses a more significant relationship to this litigation than does Pennsylvania, as evidenced by New Jersey's greater contacts with the facts involved in this litigation. See *Melville v. American Home Assurance Co., supra; Parker v. State Farm Insurance Co.,* 543 F.Supp. 806 (E.D.Pa. 1982).

Potts claims that the interpretations of the parol evidence rule by the Courts of Pennsylvania and the Courts of New Jersey are identical and that, therefore, the application of one interpretation rather than the other would make no difference in

---

**11.** The parol evidence rule is a rule of substantive contract law which provides that "when two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understanding and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 Corbin, Contracts, 357, cited in *United States v. Clementon Sewerage Authority,* 365 F.2d 609, 613 (3rd Cir.1966).

this case. Thus, argues Potts, there is no choice of law issue and the parol evidence rule as interpreted by the Pennsylvania Courts should apply in that Pennsylvania is the forum state.

■ According to the terms of the parol evidence rule, pre-contract negotiations and understandings are inadmissible if both of the following criteria are met. First, the contract must be in writing and assented to by the parties as the complete and accurate integration of the contract. Second, the proposed evidence varies or contradicts the written contract.

In the present case, under both Pennsylvania and New Jersey law, the first criterion is clearly met because of the Agreement's above-quoted integration clause. See *Dries v. Trenton Oil Co.*, 17 N.J. Super. 591, 86 A.2d 427 (1952); *United States v. Clementon Sewerage Authority, supra,* 365 F.2d at 614, n. 1; *United States Gypsum Co. v. Schiavo Bros., Inc.*, 450 F.Supp. 1291, 1302 (E.D.Pa.1978); *Gianni v. Russell and Co.*, 281 Pa. 320, 126 A. 791 (1924).

With regard to the second criterion, McCormack contends that, according to the New Jersey interpretation of the parol evidence rule, extrinsic evidence of the parties' contractual intent is always admissible in aid of the Court's interpretation of the meaning of contractual provisions, even where such evidence appears to vary or contradict the terms of an apparently unambiguous integrated written contract. Potts disagrees with this contention. However, both McCormack and Potts agree that Pennsylvania's parol evidence rule bars the admission of extrinsic evidence of the parties' contractual intent where the written contract is integrated and unambiguous.

McCormack relies upon several New Jersey cases in support of its position regarding the New Jersey parol evidence rule. A case upon which it heavily relies is *Garden State Plaza Corp. v. S.S. Kresge Co.*, 78 N.J. Super 485, 189 A.2d 448 (1963). In *Garden State,* the Superior Court reversed the trial court's ruling that certain pre-lease evidence was inadmissible pursuant to the parol evidence rule for the purpose of interpreting the lease. Specifically, McCormack relies, in large part, upon the following paragraph from *Garden State,* 189 A.2d at 454:

"We are entirely clear that the parol evidence rule applies only to prevent the substantive alteration of contractual terms agreed upon by parties and expressed in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings. But the parol evidence rule does not even come into play until it is first determined what the true agreement of the parties is—i.e., what they meant by what they wrote down. Only when that is determined is one in an appropriate position to raise the bar of the parol evidence rule to prevent alteration or impugnment of the agreement by the asserted contradictory prior or contemporaneous agreement. In other words, interpretation and construction must necessarily precede protection against forbidden contradiction or modification. And in the process of interpretation and construction of the integrated agreement all relevant evidence pointing to meaning is admissible because experience teaches that language is so poor an instrument for communication or expression of intent that ordinarily all surrounding circumstances and conditions must be examined before there is any trustworthy assurance of derivation of contractual intent, even by reasonable judges of ordinary intelligence, from any given set of words which the parties have committed to paper as their contract. Construing a contract of debatable meaning by resort to surrounding and antecedent circumstances and negotiations for light as to the meaning of the words used is never a violation of the parol evidence rule. And debatability of meaning is not always discernible at the first reading of a contract by a new mind. More often it becomes manifest upon exposure of the specific disputed

interpretations in the light of the attendant circumstances."

While the above-quoted paragraph may appear to support McCormack's position, the *Garden State* Court elsewhere further explains the paragraph's meaning and scope. For example, at 189 A.2d 455, the Court states:

"Of course, in order to justify the use of evidence of extrinsic circumstances to establish a contended-for interpretation of disputed contractual language, that interpretation must be one 'which the written words will bear.' *Deerhurst Estates v. Meadow Homes, Inc.*, supra, 64 N.J. Super., at p. [134] 149, 165 A.2d, at p. [543] 551.... Cases where the court either expressly or by clear implication found the integrated expression so indisputably clear as not to be susceptible of modification by the particular extrinsic circumstances relied upon, without violation of the parol evidence rule, are *Harker v. McKissock*, supra, 12 N.J., at p. [310] 322, 96 A.2d, at pp. [660] 665, 666 and *Adams v. Jersey Central Power and Light Co.*, 21 N.J. 8, 120 A.2d 737 (1956)."

The *Garden State* Court further states, at 189 A.2d 456:

"Repeatedly have our highest courts used negotiations antecedent to integration in arriving at and effectuating the specific intent of the parties, subject only to the caution that the construction adjudicated be compatible with the contractual language." (Citations omitted).

Perhaps most importantly, the *Garden State* Court also states, at 189 A.2d 453:

"We have concluded, for reasons to be stated, that the trial court erred in ruling out all of the proofs offered by Kresge and construing the lease without them; that *sufficient basis for a reasonable difference of opinion as to its meaning* existed to warrant admission of at least some of the proofs; and that the case should be re-tried so that the dispute of construction may be resolved on the basis of all of the evidence relevant thereto." (Emphasis added).

McCormack also relies upon the reasoning of the New Jersey Supreme Court in *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652 (1953), upon which the *Garden State* Court also quite significantly relied. According to *Schwimmer*, the parol evidence rule excludes evidence only when it is offered for the purpose of varying or contradicting the terms of an integrated contract. It does not exclude evidence offered for the purpose of interpreting and giving a meaning to those terms. The *Schwimmer* Court further reasons that the terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to vary or contradict them. In this regard, the Court further notes that language "is only too often an imperfect and uncertain means of communicating ideas and concepts." 96 A.2d at 656. However, the *Schwimmer* Court also states, at 96 A.2d 656:

"So far as the [extrinsic] evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant."

The New Jersey parol evidence rule is also discussed in *Harker v. McKissock*, 12 N.J. 310, 96 A.2d 660 (1953), a case not cited by McCormack. *Harker v. McKissock* was decided on the same day as *Schwimmer*, *supra*, and the opinions in both cases were written by Justice Heher for a unanimous Supreme Court. In *Harker v. McKissock*, the Court held that evidence of a local union's pre-agreement negotiations and understandings with the national union was properly found inadmissible by the trial court pursuant to the parol evidence rule. This extrinsic evidence was inadmissible because it was "of a substantially different intention" from the parties' intention as expressed in the written words of the integrated agreement. 96 A.2d at 666.

The decision of the New Jersey Supreme Court in *Newark Publishers' Ass'n v. Newark Typographical Union*, 22 N.J. 419, 126 A.2d 348 (1956), is also relevant to our understanding of this issue. In that case,

newspaper publishers instituted suit against the union in which they sought to compel arbitration of a dispute under an integrated collective bargaining agreement. The dispute arose out of the union's refusal to permit any of its members to operate more than one teletypesetter casting machine. Paragraph 3(a) of the collective bargaining agreement between the parties provided, in part, that "When additional teletypesetter casting machines are introduced, the manning of casting units shall be negotiated...." Paragraph 26, the binding arbitration provision of the agreement, provided, in part, that a "Grievance Committee ... shall be maintained" for the "settlement" of "any dispute (except as otherwise herein provided) arising under this contract between a signatory publisher and the Union, if such dispute cannot be settled by conciliation between the Union and the Publisher involved...." Paragraph 26 further provided that "local union laws not affecting wages, hours or working conditions, and the 1955 General Laws of the International Typographical Union, shall not be subject to arbitration."

The union contended that any dispute concerning the manning of the casting machines was subject to negotiation only, and not to arbitration. The union argued that the above-quoted parenthetical exception to arbitration in paragraph 26 applied to paragraph 3(a) as well as to the above-quoted exceptions in paragraph 26 itself. The union, therefore, concluded that the clear terms of the agreement supported its position. Alternatively, the union contended that the agreement was ambiguous and that it should be permitted to present evidence of the pre-agreement negotiations in order to clarify the parties' intent on this issue. On this latter basis, the union opposed the publishers' motion for summary judgment and requested a jury trial. The union was prepared to present evidence that, during the negotiations, the manning of the casting machines was the principal ground of dispute between the parties and was thoroughly discussed. The union's evidence would also show, claimed the union, that paragraph 3(a) was adopted merely as a stop-gap in order to avoid further dispute at that time and to enable the agreement to be completed, with the mutual understanding that the "manning" issue would be held over for future negotiation, but not arbitration.

The trial court found that there was no genuine issue as to any material fact, that there was, therefore, no need for a jury trial, and that the union had failed in its contractual duty to submit the "manning" issue to arbitration. Based upon these findings, the trial court granted the publishers' motion for summary judgment and ordered the union to submit to arbitration on this issue.

The Supreme Court unanimously affirmed the trial court's judgment on the same grounds. It determined that the agreement was unambiguous in the publishers' favor on the issue regarding which the union wished to present its evidence of pre-agreement negotiations. Therefore, it affirmed the trial court's refusal to allow the union to present such evidence. In explaining its decision, the Court stated at 126 A.2d 353:

"We are not at liberty to introduce and effectuate some supposed unrevealed intention. The actual intent of the parties is ineffective unless made known in some way in the writing. It is not the real intent but the intent expressed or apparent in the writing that controls. *Corn Exchange National Bank & Trust Co. v. Taubel,* 113 N.J.L. 605, 175 A. 55 (E.&A. 1934). And the construction of the integration is the exclusive province of the judge, unless an issue of fact be raised by evidence aliunde. *New York Sash & Door Co., Inc., v. National House & Farms Association,* 131 N.J.L. 466, 36 A.2d 891 (E.&A. 1944).

"Here, there was no undue exclusion of evidence aliunde on the hypothesis of an ambiguous contract, or otherwise. The meaning of the writing is clear, assessed as an entirety, and there was no demonstrable error of substance in the asserted exclusion of evidence 'as to the intent and meaning of the parties;' and, by the

same token, there was no denial of the right of trial by jury. The offer of proof had to do, not with the interpretive function, but rather the use of the preliminary negotiations to vary and enlarge the terms of the writing, indisputably intended by the parties to be a final and complete memorial of their bargain, the integration of the jural act, and hence the exclusive repository of the common intention as a rule of substantive law."

According to the above New Jersey cases, the trial court is often faced with a difficult task in ruling upon objections based upon the parol evidence rule. On the one hand, it must appreciate that language is often an imperfect means of communicating ideas and concepts and that extrinsic evidence may often be of aid in determining what the parties meant by their contractual language. On the other hand, the trial court must, at least initially, interpret the contract based solely upon the language of the contract. Then it must decide if the contract interpretation suggested by the proffered extrinsic evidence is so incompatible with its own interpretation that it must conclude that the proffered extrinsic evidence varies or contradicts the contractual language. If so, the evidence is inadmissible pursuant to the parol evidence rule. Stated somewhat differently, the trial court must initially determine whether or not the contractual language is unambiguous according to the standard set forth in the above-quoted language from the New Jersey cases, bearing in mind the aforementioned imperfections of language. If so, evidence of any different meaning is inadmissible pursuant to the parol evidence rule.

We shall now examine the Pennsylvania Courts' interpretation of the parol evidence rule with regard to indisputably integrated written contracts. As agreed upon by the parties, there is no doubt that, under Pennsylvania law, the parol evidence rule bars the admission of extrinsic evidence of the parties' contractual intent if the written contract is integrated and unambiguous. See *Dahath Electric Co. v.*

*Suburban Electric Development Co.,* 332 Pa. 129, 2 A.2d 765 (1938); *Merriam v. Cedarbrook Realty, Inc.,* 266 Pa.Super. 252, 404 A.2d 398 (1978); *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001 (3rd Cir.1980). Given this proposition, however, as stated in *Mellon Bank, supra,* 619 F.2d at 1011:

"Courts are left with the difficult issue of determining as a matter of law which category written contract terms fall into—clear or ambiguous."

*Mellon Bank* was a diversity action decided under Pennsylvania law. It contains a detailed discussion, consistent with Pennsylvania case law, of the legal framework within which trial judges should determine contract ambiguity issues. Most significantly, the Court states at 619 F.2d 1011:

"A Court must have a reference point to determine if words may reasonably admit of different meanings. Under a 'four corners' approach a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous. An alternative approach is for the judge to hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. We believe the latter to be the correct approach.

It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If a *reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder. *See* Corbin, Contracts § 542." (Emphasis in original).

The reasoning in the above-quoted paragraphs is premised, in part, upon the following:

"In a world where semantics is a science instead of an art we might be able to read a contract and understand it without question. However, English is often a difficult and elusive language, and certainly not uniform among all who use it. External indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms. If each judge simply applied his own linguistic background and experience to the words of a contract, contracting parties would live in a most uncertain environment."

*Mellon Bank, supra,* 619 F.2d at 1010.

The Court in *Mellon Bank* further reasons that the linguistic reference point of the parties is particularly important when contract terms are based upon specialized usages. In this regard, the Court states at 619 F.2d 1012, n. 12:

"Following the approach we outline in this opinion a consistent result could be reached in each case—the parties would be bound to the same meaning of the external signs of their intent. When the judge who knows only common usage is told that a specialized usage can be shown which is common to both parties, he will realize an ambiguity can exist and will admit evidence to determine the meaning by which the parties should be bound. Under a 'four corners' approach to the question of ambiguity, the result would depend on which judge heard the case."

The Court later points out, however, at 619 F.2d 1012, n. 13:

"Even given this approach, there will be cases where a claim of ambiguity is virtually impossible, and a failure to proffer an argument for ambiguity in the answer to pleadings or motions might be sufficient to allow a judge to declare terms unambiguous. There is no reason for a court to consider seriously a complaint or argument which seeks to mischaracterize an agreement. *See e.g. East Crossroads Center, Inc. v. Mellon-Stuart Company,* 416 Pa. 229, 205 A.2d 865 (1965). However, the court must entertain the argument before it can be rejected. The judge should not abandon his legal expertise or knowledge of the English language. We only assert that the judge's own semantic expertise does not stand sacrosanct against a reasonable alternative semantic reference presented by the parties. If no 'reasonable' alternative meanings are put forth, then the writing will be enforced as the judge reads it on its 'face'. *See International Systems, Inc. v. Personnel Data Systems,* [274 P.A.Super. 500, 418 A.2d 518] (1980)."

In *Mellon Bank,* the Court held, *inter alia,* that the District Court properly admitted extrinsic evidence regarding the meaning of the contractual term "insolvency". This holding was grounded, it appears, upon the fact that "insolvency" is a specialized commercial term whose meaning must be determined from the linguistic reference point of the parties, which may very well be different from a trial judge's linguistic reference point on this matter.

From this review of New Jersey and Pennsylvania law, we conclude that the interpretations of the parol evidence rule by the Courts of New Jersey and the Courts of Pennsylvania are functionally equivalent with regard to an indisputably integrated contract. Although the Courts of the two states discuss this matter in somewhat different terms, they reach essentially the same result. Both caution trial judges that contractual language is often an inadequate method of expressing intention and that other evidence may often help to make up for such inadequacies. Also, in both jurisdictions, the trial judge must examine both the contractual language and the contract interpretation suggested by the proffered extrinsic evidence. He must then decide whether the meaning of the contractual language is so clear that any different meaning suggested by other evidence must be found to be without sufficient basis in the contract language. If so, the other proffered evidence must be found to have been offered for the purpose of varying or contradicting the written contract and, therefore, must be found to be inadmissible

pursuant to the parol evidence rule. The issue of the requisite clarity, or lack of ambiguity, of contractual language is discussed somewhat differently by the Courts of each jurisdiction, but we believe that the standard for the resolution of this issue is essentially the same in both jurisdictions. This issue may also be couched in terms of whether or not the contract interpretation put forth by the party seeking the admission of extrinsic evidence is sufficiently based upon the language of the contract. Both jurisdictions have adopted a reasonableness standard in determining this issue. In Pennsylvania, this reasonableness standard is evident from a portion of one of the above quotations from *Mellon Bank, supra*, which we repeat here:

> "If a *reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder."

(Emphasis in original).

*Mellon Bank, supra*, 619 F.2d at 1011.

In New Jersey, this reasonableness standard must also be found to prevail based upon the above-quoted conclusion of the Court in *Garden State, supra*, which we repeat here, in part:

> "We have concluded, for reasons to be stated, that the trial court erred in ruling out all of the proofs offered by Kresge and construing the lease without them; that *sufficient basis for a reasonable difference of opinion as to its meaning* existed to warrant admission of at least some of the proofs;...." (Emphasis added).

*Garden State, supra*, 189 A.2d at 453.

■ Having concluded that the interpretations of the parol evidence rule by the Courts of Pennsylvania and the Courts of New Jersey are functionally equivalent with regard to an indisputably integrated contract, we must, of course, also conclude that the application of one interpretation rather than the other could not affect the outcome of this case. Therefore, contrary to McCormack's contention, no choice of law issue exists regarding the parol evidence rule.

We must still, of course, decide whether or not the provisionally admitted evidence presented by McCormack as to the parties' pre-Agreement negotiations and understandings should be barred from our consideration as irrelevant pursuant to the parol evidence rule as applied in Pennsylvania, the forum state.

McCormack claims that this evidence shows that both Potts and McCormack understood and intended the Agreement to require Potts to pay for marine services charges independently of, and in addition to, the paragraph 6(a) and (b) payments. We shall briefly describe this evidence.

There are four items of documentary evidence upon which McCormack relies, which we shall discuss chronologically. The first is a letter, dated June 25, 1980, from David C. Denise, the former president of McCormack, to Karl F. Goos, the president of Potts. The body of this letter stated:

> "This letter shall serve as an acknowledgement of discussions between Mr. Karl F. Goos and David C. Denise regarding our providing services in connection with the handling of coal for you at South Amboy, New Jersey.
>
> 1. We will offload unfrozen unit trainloads of coal delivered to our terminal (at a rate of approximately 1,000 net tons per hour).
>
> 2. We will stockpile the offloaded material at your risk. (Maximum capacity of 250,000 net tons is available for a single grade. Capacity is reduced dependent on the number of grades and degree of permitted contamination).
>
> 3. We will arrange for barges as required by you.
>
> 4. We will load the barges from unfrozen stockpiles (at a rate of approximately 1,000 net tons per hour).
>
> 5. We will arrange for tug(s) as required by you.
>
> Our fees for these services are to be as follows:

Three ($3) U.S. Dollars per net ton (2,000 pounds) handled. Payable two ($2) Dollars upon offloading. Balance of fees payable upon delivery to shipside. Terms net cash upon receipt of invoice. Barge costs are to be invoiced in U.S. Dollars at prevailing harbor rates plus cargo insurance at cost. Tugs at prevailing harbor rates. Both payable upon delivery to shipside.

Should the average annual stockpiled quantity exceed 50,000 net tons per month a monthly storage charge of $1.50 per net ton will be invoiced.

You will guarantee that a minimum of 500,000 net tons will be provided for handling by us and accordingly a minimum guaranteed annual payment of $1,500,-000 U.S. will be due. Such minimum to be appropriately prorated on a monthly basis.

If the above terms correctly express your understanding of our discussions, please so acknowledge and we will arrange to have a detailed agreement drafted."

The second is a letter from Mr. Goos to Mr. Denise, dated August 25, 1980, which stated, in part:

"This letter will summarize our understandings relative to utilizing your South Amboy, New Jersey loading facility.

1. Clayton Sand will off-load, at the rate of approximately 1,000 tons per hour, anthracite coal, bituminous coal and/or coke delivered to your South Amboy, New Jersey terminal.

2. The material will be off-loaded and stockpiled and will remain on your property at our risk. You have indicated that there is maximum storage capacity of 250,000 tons on the basis of single grade. Such capacity is reduced depending on the number of separate piles that have to be maintained.

3. You will black-top the ground storage area or put in a concrete pad to avoid contamination of coal with sand or other contaminants.

4. You will arrange for barges as they may be required from time to time. We probably would need a minimum of six each time we load a vessel. You had indicated barge rental at the present time to be $100.00 per day.

5. You will arrange for tugs as required. You indicated cost of tugs to be $150.00 per hour at the present time.

6. You have agreed to load barges from stockpiles at the rate of approximately 1,000 tons per hour.

7. Your charges for unloading from railcars into stockpile and from stockpile on board barge is $3.00 per ton. $2.00 per ton is payable upon completion of unloading of railcars; $1.00 per ton is payable upon loading and delivery to ocean ship side. Terms are net cash on receipt of invoices.

Barge costs and tug rates might vary in accordance with prevailing harbor rates. We will assume insurance of cargo. Payment of tugs and costs for barges will be payable upon completion of loading of ocean vessel.

We will guarantee a through-put of a minimum of 500,000 tons per year commencing after acceptable railroad freight rates have been published and are in effect. Six months thereafter, we will have the option to increase the minimum quantity to 1,000,000 annual tonnage and at such time will have the exclusive use of your facility for a minimum period of five years with an option to extend by an additional five years."

McCormack contends that these letters prove that the parties intended that Potts would pay for the barges and tugs and that, in addition, Potts would pay a minimum fee to McCormack for the Terminal.

The third item is the first draft of the Agreement, dated October 24, 1980, which was prepared by McCormack's counsel. Paragraph 5 of this draft, entitled "Barges and Tugs", stated, in part:

"Barging of product from the terminal and/or unloading of product from the barges is not part of the handling services under this Agreement. MTC shall, however, as agent for Potts, exercise its best efforts to arrange for the charter of

barges and tugs as required from time-to-time for movement of product from the terminal, at then current prevailing harbor rates and terms of charter (which may vary from time-to-time with market conditions).... The barge and tug owners shall bill Potts directly, which shall pay such bills directly to them when due."

Also, paragraph 6 of this draft is entitled "Payments" and is almost identical to paragraph 6 of the final Agreement. However, unlike paragraph 6 of the final Agreement, it does not contain any reference to paragraph 5. (See paragraph 6(c)(iii) of Agreement, *supra*). McCormack contends that this draft proves that during the initial negotiations, the parties intended that Potts would barge the coal to the vessels, pay the barge owners directly, and, in addition, that Potts would pay the minimum monthly fee of $250,000.00 to McCormack for the use of Terminal.

The fourth item is the second draft of the Agreement, dated December 19, 1980, which was prepared, for the most part, by Potts' counsel. For purposes of the present controversy, paragraphs 5 and 6 of this draft contained essentially the same language as paragraphs 5 and 6 of the final Agreement. McCormack submits that this draft constituted a significant change in Potts' negotiating position in that Potts now proposed that McCormack pay the barge and tug owners directly, with Potts reimbursing McCormack at McCormack's cost plus 10%.

In addition to the documentary evidence, McCormack also relies upon the testimony of Mr. Denise. According to his testimony, the initial discussions between Mr. Goos and him were based on the presumption that "the barges were to be provided by Potts and really that McCormack's involvement would cease once the product was put onto the barges." (Notes of Testimony (hereinafter "N.T."), p. 118). By the time of Mr. Denise's letter to Mr. Goos, dated June 25, 1980, *supra*, the parties contemplated, testified Mr. Denise, that McCor-

mack "would find the available barges and tugs and that the barges and tugs would be billed directly to Potts." (N.T., p. 451). Mr. Denise further testified that the draft Agreement of December 19, 1980 was presented to him in Potts' New York City office by Potts' counsel in the presence of Mr. Goos. Mr. Denise told them that he was unhappy with the provision in paragraph 5 of this draft which required McCormack, rather than Potts, to pay the barge and tug owners directly, with Potts reimbursing McCormack at McCormack's cost plus 10%. In this regard, he testified that he conveyed to them the following:

"The concept of McCormack being responsible for the specific marine services had not been agreed to prior to this draft, and I knew that it was something that was going to be not—I felt that it was a strong possibility to be unacceptable to Mr. Waterman.[12] (N.T., p. 220).

Mr. Denise further testified:

"We discussed the fact that this [marine services] was a secondary operation to the original contemplated and that the calculations for what was due by Potts would have to be done separately and independently of the throughput agreement which we had already agreed to in principle, both myself with Mr. Goos and also had gotten approval on that aspect from Mr. Waterman." (N.T., p. 222).

Based upon the above pre-Agreement documentary and testimonial evidence, McCormack argues that, from the inception of the discussions leading to the Agreement through the signing of the Agreement, both parties understood and agreed that marine services were distinct from throughput services, even after McCormack had agreed that marine services could be part of the Agreement and later agreed, apparently grudgingly, to pay directly for them subject to McCormack's reimbursement by Potts. Correspondingly, argues McCormack, both parties understood and agreed that the payment for marine services was distinct from the pay-

---

12. Randy Waterman is McCormack's principal.

ment for throughput services. In this regard, contends McCormack, the inclusion of paragraph 6(c)(iii) in the December 19, 1980 draft and in the final Agreement was intended by both parties to be merely perfunctory in order to correspond with the new language in the same draft and Agreement requiring direct marine services payments by McCormack and reimbursement by Potts. In no way, continues McCormack, was its inclusion intended to modify the indisputably complete independence of the marine services payment obligation and the throughput services payment obligation as set forth in the October 24, 1980 draft.[13]

■ For the following reasons, we conclude that the language of the Agreement unambiguously supports Potts' interpretation of the Agreement and that the contrary interpretation set forth by McCormack is not reasonable. Therefore, we shall exclude from our consideration as legally irrelevant McCormack's proposed evidence concerning the parties' pre-Agreement negotiations and understandings.

Stated simply, we completely adopt Potts' interpretation of the Agreement, *supra,* which we shall not repeat here, as the unambiguous and only reasonable interpretation of the language of the Agreement, even after having carefully and fully considered McCormack's alternative interpretation and McCormack's aforementioned proffered evidence in support of its interpretation. McCormack's interpretation, *supra,* is simply not supported by the language of the Agreement. For example, McCormack has repeatedly and correctly pointed out to us during the long course of this proceeding that, on an annual basis, the Agreement required that the marine services charges were to be paid by Potts in addition to the monthly payments. Therefore, continues McCormack, the Agreement should be interpreted as requiring Potts to do likewise on a less than annual basis. However, the Agreement did

not state that. Instead, it expressly and clearly required that the marine services charges be offset against the paragraph 6(a) and (b) payments on a less than annual basis.

The remainder of McCormack's interpretation of the language of the Agreement, *supra,* is a combination of a mischaracterization[14] and contrived straining of the plain language of the Agreement. In this regard, see *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 663 (1982), in which the Pennsylvania Supreme Court held that an agreement was not ambiguous and that extrinsic evidence of its meaning was irrelevant, and explained:

"In holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one; scarcely an agreement could be conceived that might not be unreasonably contrived into the appearance of ambiguity. Thus, the meaning of language cannot be distorted to establish the ambiguity."

Our finding of a lack of ambiguity in the Agreement and the irrelevancy of McCormack's extrinsic evidence is further based upon the fact that the disputed provisions of the Agreement do not contain terms of specialized usage for which the parties have a different linguistic point of reference from that of the Court. *Mellon Bank, supra.* McCormack has not contended otherwise.

We note here that McCormack has also presented evidence regarding the conduct of the parties during the operation of the Agreement. McCormack contends that this evidence shows that Potts knew and understood that the intent of the Agreement was for Potts to pay the marine services charges in addition to the paragraph 6(a) and (b) payments. McCormack also contends that this evidence is relevant to our interpretation of the Agreement and should be considered for this purpose.

---

**13.** Potts disagrees with McCormack's interpretation of this pre-Agreement evidence and contends that Mr. Denise was not a credible witness.

**14.** See *Mellon Bank, supra,* 619 F.2d at 1012, n. 13.

However, because of our having determined that the Agreement is integrated and unambiguous and that McCormack's interpretation of it is unreasonable, we cannot not consider such evidence for the purpose of interpreting the Agreement. *Atlantic Refining Co. v. Wyoming Nat. Bank,* 356 Pa. 226, 51 A.2d 719 (1947); *School District of Butler Tp. v. School District,* 374 Pa. 96, 97 A.2d 360 (1953); *Koshliek v. Board of Freeholders of Passaic Cty.,* 144 N.J.Super. 336, 365 A.2d 492 (1976); *Midland Carpet Corp. v. Franklin Associated Prop.,* 90 N.J.Super. 42, 216 A.2d 231 (1966).

In the event that we would, as we have, adopt Potts' interpretation of the Agreement, McCormack has made an alternative argument. This argument is that Potts materially breached the Agreement, thereby becoming liable to McCormack, by regularly failing to make timely payments pursuant to the Agreement, particularly the paragraph 6(b) monthly payments. This argument has no merit. In the first place, under Potts' interpretation of the Agreement, as indicated *supra,* Potts had considerably overpaid McCormack from before the beginning of August, 1981 through September 8, 1981, when McCormack terminated the Agreement, whereas McCormack's termination was based upon Potts' alleged default in August, 1981. In light of this, Potts' failure to make timely and adequate payments during the early months of the Agreement is simply not material to the present action, even assuming that Potts had no justification under the Agreement for failing timely to make certain payments.

Secondly, the facts of the cases [15] which McCormack cites in support of this argument bear virtually no resemblance to the facts of the present case, nor does their reasoning in any way support McCormack's position.

For all of the foregoing reasons, we find that Potts was not in default of the Agreement as of August 19, 1981 or at any time

thereafter, and, therefore, we shall dismiss McCormack's Complaint against Potts.

## II.  POTTS' COUNTERCLAIMS AGAINST McCORMACK

■  Based upon the foregoing, we find that McCormack's termination of the Agreement on September 8, 1981 and refusal to perform pursuant to the Agreement thereafter was an anticipatory repudiation of the Agreement and constituted a material breach of the Agreement, thereby giving rise to Potts' counterclaims against McCormack, which we shall now discuss.

### A.  Vessel and Railcar Demurrage Charges and Excess Marine Charges

■  Potts claims that McCormack is liable to Potts on this counterclaim in the amount of $228,292.97, consisting of $89,794.79 in vessel demurrage charges, $3,280.00 in railcar demurrage charges, and $135,218.18 in excess marine charges. Potts' claim is based upon paragraph 3(e) of the Agreement, which stated, in part:

"In the event MTC fails to unload all or part of the product from railroad cars, or in the event MTC shall fail to load all or part of the product onto barges, all in accordance with this paragraph 3 and subject to paragraph 11 [force majeure] below, then MTC shall pay for all direct damages and also for demurrage costs (either rail or ship) which Potts incurs."

Paragraph 3(a) and (c) of the Agreement specified the rates at which McCormack was obligated to unload the product from the railcars and load it onto the barges. Potts alleges that McCormack's failure to perform at these rates caused Potts to incur the damages it claims herein.

One of McCormack's defenses to this counterclaim is based upon paragraph 12(b) of the Agreement, which stated, in part:

"If MTC shall not perform at the rates specified in paragraph three (3) (a) and (c) above, or if MTC shall not perform

**15.** *Medivox Productions, Inc. v. Hoffman-La-Roche, Inc.,* 107 N.J.Super. 47, 256 A.2d 803 (1969); *Zulla Steel, Inc. v. A and M Gregos, Inc.,* 174 N.J.Super. 124, 415 A.2d 1183 (1980).

pursuant to paragraph five (5) hereof, Potts shall give notice to MTC, whereupon MTC shall have ten (10) days to cure the default, failing which MTC shall be in default."

We also note that paragraph 17 of the Agreement, entitled "Notices to be in Writing", stated, in part:

"All notices under this Agreement shall be in writing and sent to the parties at the following addresses: ...."

It is undisputed that Potts never notified McCormack in writing of McCormack's alleged failure to perform at the rates specified in paragraph 3(a) and (c) of the Agreement. No specific oral notification was even given. Therefore, this counterclaim shall be denied.

### B. *Potts' Liability to Conrail*

■ This counterclaim stems from an agreement between Potts and the Consolidated Rail Corporation ("Conrail"), which resulted in Conrail's issuance of a reduced rate, annual volume tariff regarding Conrail's shipment of Potts' product to the Terminal. The tariff was filed with the Interstate Commerce Commission on March 26, 1981, and was to be in effect from April 6, 1981 through April 5, 1982. Under the tariff, with certain exceptions, Potts was liable to Conrail to the extent that Potts failed to meet the tariff's 1,000,-000 ton minimum annual volume shipping requirement. Potts shipped considerably less than 1,000,000 tons of product to the Terminal via Conrail, and thus became potentially subject to liability to Conrail. On this basis, Conrail filed a proof of claim against Potts in the amount of $3,400,071.88.[16]

Potts contends that McCormack should be liable to Potts in the same amount that Potts is liable to Conrail because Potts' failure to meet the minimum annual volume requirement of the tariff was a natural and foreseeable consequence of McCormack's unlawful termination of the Agreement. However, we shall deny this counterclaim. While we agree that McCormack unlawfully terminated the Agreement, we find that Potts' failure to meet the tariff's minimum annual volume requirement was not a natural and foreseeable consequence thereof. Potts has failed to present sufficient evidence that McCormack should have reasonably foreseen that McCormack's termination of the Agreement would result in Potts' liability to Conrail. Potts did show that McCormack's David Denise had represented to a Conrail employee, prior to the McCormack-Potts Agreement, that the Terminal could handle over a million tons of product annually. However, there is no evidence that McCormack ever knew or should have known what was actually contained in the tariff that was eventually negotiated between Potts and Conrail, including whether or not the tariff even contained an annual volume requirement and consequences for Potts' failure to meet the requirement. Furthermore, the Agreement between McCormack and Potts preceded the issuance of the tariff by approximately three months.

Having thus disposed of this counterclaim, it is unnecessary for us to rule on McCormack's additional defense that Potts' evidence as to its ability to meet the annual volume requirement absent McCormack's termination of the Agreement was mere non-probative speculation.

### C. *Interference With Contract and Prospective Economic Advantage*

■ In this counterclaim, Potts alleges that McCormack unlawfully interfered with Potts' contracts with two of its customers, thereby causing Potts to lose expected profits in the amount of approximately $160,000.00. Potts claims that McCormack is liable to Potts in this amount.

The parties agree that the tort of interference with contract and/or prospective economic advantage requires proof of all of the following elements: (1) a contractual or prospective contractual relationship; (2) a

---

**16.** Potts and Conrail are negotiating to settle Conrail's claim. Potts states: "When the claim is liquidated Potts will move to open the record in this proceeding to give McCormack the benefit of any reduction in Potts' liability to Conrail." Potts' Post-Trial Brief, p. 27, n. 9.

purpose or intent to harm the plaintiff by preventing the relationship from occurring or continuing; (3) the absence of privilege or justification; and (4) actual damage resulting from the defendant's conduct. See Restatement (Second) of Torts § 766B (1979).

In brief, Potts alleges that it had contracts for the sale of coal to two of its customers and that it intended to ship the coal through the Terminal. Further, prior to McCormack's termination of the Agreement on September 8, 1981, McCormack had begun negotiations with Potts' two customers for McCormack to sell coal to them and ship it through the Terminal. Potts claims that McCormack's termination of the Agreement prevented Potts and its customers from fulfilling their contracts. Also, McCormack's aforementioned negotiations with the customers eventually (at some time after the termination of the Agreement) resulted in contracts between McCormack and them. In common parlance, Potts alleges that McCormack intended to, and did, in fact, steal Potts' customers.

Although Potts' contentions have some appeal, McCormack's defense points out two critical factors, which we accept as dispositive in denying this counterclaim. First, Potts, by its own admission, was not contractually required to perform its contracts through the Terminal, but, rather, had the option of shipping product through other ports, which it sometimes did. Potts did not explain why the contracts in question were not performed through another port or if Potts would have sustained any significant economic loss by so doing. Second, Potts presented no testimony at all from any representatives of the two customers in question. Therefore, there is no testimony from them tending to confirm Potts' rather cursory testimony (unsupported by any documentation) that the contracts actually existed. Additionally, there is thus no substantial evidence that McCor-

mack's actions significantly interfered with their business relationships with Potts. For the foregoing reasons, this counterclaim shall be denied.

### D. *Lost Product*

In this counterclaim, Potts alleges that McCormack has failed to account for 14,758 tons of anthracite fines, a type of anthracite coal, that Potts shipped to the Terminal. In that each ton is, without dispute, claimed by Potts to be worth $25.37, Potts claims damages herein of $374,418.55. According to Potts' unchallenged computations, the 14,758 tons represents the difference between the amount of anthracite fines that was loaded onto railcars going to the Terminal and the amount that McCormack loaded onto barges.[17]

McCormack contends that much of the product could have been lost in transit to the Terminal rather than through any fault of McCormack's. However, McCormack has no response to the critical fact that McCormack's own unloading invoices to Potts state that McCormack unloaded at least as much of the product in question from the railcars as was originally loaded onto the railcars according to Potts' computations. We agree with Potts that McCormack cannot be permitted to claim that it may not have received product for which it had already charged Potts for unloading.

McCormack also contends that this counterclaim must be denied because Potts failed to give notice to McCormack, pursuant to the above-quoted portion of paragraph 12(b) of the Agreement, of McCormack's alleged loss of this product. However, paragraph 12(b) required that notice be given only if McCormack did not perform at the specified *rates* of unloading and loading product. No notice by Potts was required in the present situation.

For all of the foregoing reasons, Potts is entitled to damages from McCormack on this counterclaim in the amount of $374,418.55.

---

**17.** Potts presented some evidence to indicate that much of this "lost product" resulted from McCormack's failure to unload all of the prod- uct from the railcars before they were returned to Conrail. Such evidence, however, is not necessary to our determination herein.

### E. *Refund of Excess Payments*

Potts' entire argument on this counter-claim states, on page 32 of its post-trial brief:

"Potts paid to McCormack a total of $1,839,963.53. McCormack rendered services valued at $1,182,652.54, and invoiced Potts for same. Since McCormack wrongfully terminated the Agreement, it is obligated to refund to Potts the amounts paid in excess of the value of services rendered, i.e., $657,310.99."

Potts cites no authority in support of this counterclaim nor does it state any legal theory under which it may be entitled to a recovery of damages. Therefore, this counterclaim shall be denied.[18]

---

**18.** The rest of Potts' counterclaims are without    merit and shall be denied.