**In re F.A. POTTS AND CO., INC., Debtor.**

**McCORMACK TERMINAL COMPANY, INC., Plaintiff,**

v.

**F.A. POTTS AND CO., INC., et al., Defendants.**

**Bankruptcy No. 81–03639 T. Adv. No. 82–1467.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 10, 1987.

See also, Bkrtcy., 20 B.R. 3; Bkrtcy., 49 B.R. 517.

Michael M. Baylson, Duane, Morris and Heckscher, Philadelphia, Pa., for McCormack Terminal Co., Inc.

David L. Braverman, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., for F.A. Potts and Co., Inc.

Gary Schildhorn, Adelman, Lavine, Krasny, Gold & Levin, Philadelphia, Pa., for Creditors' Committee.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

In this adversary proceeding, the plaintiff, McCormack Terminal Company, Inc. ("McCormack") seeks to establish a proof of claim against F.A. Potts and Co., Inc. ("Potts"), the Chapter 11 debtor/defendant, in an amount in excess of $15,000,000.00

based upon an alleged pre-petition breach of contract by Potts. Potts denies any liability to McCormack and filed a counterclaim for more than $4,000,000.00.

Following a lengthy trial, we denied all relief requested by McCormack and entered judgment in favor of Potts on one count of its counterclaim in the amount of $374,418.55. We denied all other relief on Potts' counterclaim. McCormack then appealed to the United States District Court for the Eastern District of Pennsylvania. Potts did not file a cross-appeal. For reasons discussed *infra*, the District Court reversed our decision denying all relief to McCormack and remanded this matter to us for further proceedings pertaining to McCormack's claim. The District Court affirmed our judgment granting Potts' counterclaim in the amount of $374,418.55. Therefore, Potts' counterclaim is not before us upon remand.

Our prior lengthy and detailed Opinion is reported at 42 B.R. 712 (Bankr.E.D.Pa. 1984). In that Opinion, we agreed with Potts' interpretation of the Agreement between the parties and, therefore, concluded that Potts had not breached the Agreement and, thus, was not liable in any respect to McCormack. We found that the language of the indisputably fully integrated Agreement unambiguously supported Potts' interpretation thereof. Therefore, we did not consider the extrinsic evidence regarding the parties' contractual intent which was proffered by both parties, particularly by McCormack.

In its Memorandum, the District Court ruled that the Agreement was ambiguous and remanded the matter to us for consideration of the aforementioned extrinsic evidence. For the following reasons, and after having carefully and fully considered the Agreement and all of the other evidence relating to the parties' contractual intent, we conclude that Potts' interpretation of the Agreement is correct and that, therefore, Potts did not breach the Agreement and has no liability to McCormack.

McCormack is a New Jersey corporation which owns and operates a rail and water terminal facility ("the Terminal") located in South Amboy, New Jersey. Potts is a New York corporation, with its principal place of business located in Pottsville, Pennsylvania. Potts is engaged in the business of buying and selling coal and related materials.

The Agreement in question between the parties was executed on December 23, 1980. The issue before us is the proper interpretation of Potts' payment obligations under the Agreement. In short, if we accept Potts' interpretation thereof, Potts has no liability to McCormack. If we accept McCormack's interpretation, Potts may be liable to McCormack for breach of contract.

In general, the Agreement provided that, in return for certain payments made by Potts to McCormack, Potts was granted exclusive use of the Terminal for five years beginning on April 1, 1981 and McCormack was to perform various services regarding the product [1] shipped by Potts to the Terminal. Such services included unloading the product from railcars at specified rates, storing it at the Terminal, and loading it onto barges at specified rates.

The disputed provisions of the Agreement are paragraphs 5 and 6. Paragraph 5 was entitled "Barges and Tugs." It stated in part: "Barging of product from the terminal to ship side is part of the handling services under this Agreement." Paragraph 5 further stated: "The barge and tug owners shall bill MTC,[2] which shall pay such bills when due.... As consideration for the service performed by MTC pursuant to this paragraph 5, MTC shall be promptly reimbursed at its cost plus 10% for services rendered." These paragraph 5 services are known as "marine services."

Paragraph 6 of the Agreement stated in its entirety:

---

1. Under the Agreement, "product" is defined as "anthracite coal, bituminous coal and/or coke."

2. McCormack is referred to as "MTC" in the Agreement.

6. *Payments.* In consideration of the services to be rendered by MTC as above, Potts will pay MTC:

(a) $250,000 upon signing of this Agreement by both parties.

(b) $250,000 by May 1, 1981 and on or before the first day of each month thereafter through the duration of this Agreement.

(c) MTC shall credit Potts in the full amount of payments received as above, and shall bill against that credit periodically as services are rendered on the following basis:

(i) Two dollars ($2.00) per ton for product unloaded from railroad cars at the terminal site.

(ii) One dollar ($1.00) per ton for product loaded into barges at the dock side of the terminal site.

(iii) Amounts due pursuant to paragraph five (5) hereof.

(iv) As of April 1, 1982 and each year thereafter, three dollars ($3.00) per ton for each ton, if any, whereby the total tonnage of product delivered by Potts to the terminal during the preceding 12 months was less than 1,000,000 tons.

(d) The amount of excess (if any) of such billings (figured on the basis stated above) over the then credit for Potts referred to above, on or before the 10th day following billing for any month in which such excess (if any) arose.

The monetary figures stated in paragraph 6(b) and (c) were subject to cost-of-living adjustments every six months, according to paragraph 7 of the Agreement. Beginning on July 1, 1981, the paragraph 6(b) payment obligation increased from $250,000.00 to $256,665.00.

The critical dispute in the interpretation of the Agreement is whether, as McCormack contends, charges for paragraph 5 marine services were to be paid independently of and in addition to the paragraph 6(a) and (b) payments, with the result that the marine services charges could not be offset against Potts' paragraph 6(a) and (b) payments.[3] Potts, of course, contends that the marine services charges, like the throughput charges, were to be offset against its paragraph 6(a) and (b) payments. Thus, states Potts, for every month from May, 1981 onward, Potts was obligated to pay only the paragraph 6(b) monthly payment unless the charges for throughput services and/or marine services were high enough for a particular month to obligate Potts to make an additional payment for that month pursuant to paragraph 6(d). In our prior Opinion, at 42 B.R. 715–17, we discussed in some detail McCormack's invoices to Potts and Potts' payments to McCormack through September 8, 1981, when McCormack terminated the Agreement for Potts' alleged default thereunder. For present purposes, it is necessary only to note that Potts was clearly not in default under its interpretation of its payment obligations, but arguably was in default under McCormack's interpretation.

The District Court held that New Jersey law governs all substantive matters in this proceeding, including, of course, the subject contract interpretation issue. Under New Jersey law, the polestar of construction of a contract is to discover the intention of the parties. *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652 (1953); *Kearny PBA No. 21 v. Town of Kearny*, 81 N.J. 208, 405 A.2d 393 (1979). In *Kearny, supra*, the Supreme Court of New Jersey stated at 405 A.2d 400:

"Any number of interpretative devices have been used to discover the parties' intent. These include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct. Several of

---

**3.** It is undisputed that the charges for McCormack's unloading and loading services ("throughput" services) could be offset against Potts' paragraph 6(a) and (b) payments. See paragraph 6(c)(i) and (c)(ii).

these tools may be available in any given situation—some leading to conflicting results. But the weighing and consideration in the last analysis should lead to what is considered to be the parties' understanding. Individual interpretative rules should be subordinated to that goal."

In accord with the above quotation from *Kearny*, we shall attempt to discover the parties' intention, beginning, of course, with the language of the Agreement itself. Potts contends that the language and structure of the Agreement are simple, clear, and explicit regarding Potts' marine services payment obligations. As to structure, Potts points out that paragraphs 3, 4 and 5 describe *services* which McCormack has agreed to perform for Potts. On the other hand, paragraph 6 is entitled *"Payments"* and describes the *payments* which Potts is obligated to make to McCormack in consideration of the *"services"* to be rendered by McCormack "as above." Therefore, argues Potts, the structure of the Agreement is consistent with Potts' belief that all of Potts' payment obligations are to be accounted for only under paragraph 6, as opposed to Potts having an independent payment obligation under paragraph 5.

Potts more specifically contends that the language of the Agreement clearly states that the marine services charges must be offset against its paragraph 6(a) and (b) payments. Paragraph 6(c)(iii) simply and explicitly states that the marine services charges are to be billed against the credit which Potts has compiled with its payments. Why, asks Potts, would paragraph 6(c)(iii) even be in the Agreement if Potts had an independent payment obligation under paragraph 5?

McCormack claims that the language of the Agreement can very reasonably be interpreted to support its position. According to McCormack, the phrase "promptly reimbursed" in paragraph 5 denotes a "payment" which Potts must make to McCormack. Therefore, the phrase "payments received as above" in paragraph 6(c) can reasonably refer to paragraph 5 pay-

ments as well as to paragraph 6(a) and (b) payments. If so, under paragraph 6(c), Potts would be credited with paragraph 5 payments as well as paragraph 6(a) and (b) payments. Thus, McCormack continues, paragraph 6(c)(iii) can best be understood as a mere bookkeeping provision. In this regard, McCormack states at page 16 of its Brief on Remand:

"The concept of 'crediting' Potts' account with the payments made by Potts and 'debiting' Potts' account with the bills rendered to Potts is an ordinary bookkeeping, ledger-controlled accounting method."

McCormack further points out that paragraph 6(c)(iv) required, on an annual basis, that the paragraph 6(b) payments be totally offset by throughput (non-marine services) charges even if Potts delivered less than 1,000,000 tons of product to the Terminal during a given year. Therefore, argues McCormack, if marine services charges were to be paid in addition to throughput charges on an annual basis, marine services charges should also be determined to be payable separately and in addition to throughput charges on an ongoing (less than annual) basis. Along this line, McCormack further states that Potts' obligation to make prompt reimbursement to McCormack for marine services would be consistent only with McCormack's interpretation of the Agreement because under certain scenarios, Potts would, in effect, not be paying for some or all of the marine services charges until the annual reconciliation called for by paragraph 6(c)(iv).

Regarding this "prompt reimbursement" issue, Potts claims that McCormack is promptly reimbursed either as an offset against the advance monthly payments or, pursuant to paragraph 6(d), within ten days after billing to the extent that the monthly payments are insufficient.

In response to McCormack's interpretation of paragraph 6(c)(iii), Potts states at pages 14–15 of its Brief on Remand:

"What McCormack overlooks, however, is that if Potts had no obligation to pay marine services charges until such

charges were billed, and McCormack's billing obligations are contained exclusively in paragraph 6(c)(iii), the amounts due under paragraph 5 would not have been a payment 'received' as used in the first sentence of paragraph 6(c). The phrase 'payments *received* as above' could not possibly refer to the *'amounts due'* but not yet *'received'*, under paragraph 5. Nor could 'amounts *due'* possibly be a *'credit'* as that term is used in paragraph 6(c). Stated simply, an 'amount *due'* cannot simultaneously be a 'payment *received'* or be accounted for as a *'credit.'*

As between Potts' interpretation, under which the words 'credit' and 'received' in paragraph 6(c) and the language of paragraph 6(c)(iii) are given the full and intended effect, and McCormack's view, where such language is internally inconsistent or simply surplusage, the rules of contract interpretation require this Court to adopt the former." (Emphasis in original).

After having carefully considered the arguments of both parties, we conclude that the language and structure of the Agreement strongly favors Potts' interpretation of the Agreement for the reasons stated by Potts *supra.* McCormack's admittedly cumbersome interpretation is conceivable. However, if the parties' intention was as McCormack contends, it is difficult to believe, strictly from reading the Agreement itself, that the parties could not have found countless less convoluted and confusing ways of expressing such intention. On the other hand, Potts' interpretation, especially regarding paragraph 6(c)(iii), gives the language in the Agreement its most natural and reasonable meaning.

Because, however, the language of the Agreement was determined to be ambiguous by the District Court, we shall carefully consider the extrinsic evidence proffered by the parties.

 McCormack contends that the pre-Agreement negotiations, correspondence, and drafts of the Agreement prove that both parties intended that Potts have an independent marine services payment obligation. We set forth this evidence in detail in our prior Opinion at 42 B.R. 724–27, and will not quote that portion verbatim here, particularly since McCormack, in its Brief on Remand, uses only one sentence to support this contention. Stated simply, none of this evidence has any significant probative value as to the parties' contractual intention. At most, it tends to indicate that McCormack wanted Potts to have an independent marine services payment obligation. It nowhere shows that Potts was willing to accede to McCormack's wishes.[4] To the contrary, Karl F. Goos, the president of Potts, testified consistently and convincingly that he never agreed, and never would have agreed, to Potts' having any greater responsibility and liability for marine services than that embodied in the final Agreement. Even David C. Denise, the former president of McCormack, essentially admitted that Mr. Goos objected to the October 24, 1980 draft of the Agreement, which clearly contained an independent marine services payment obligation for Potts. (Notes of Testimony, page 221). Furthermore, this October 24, 1980 draft, upon which McCormack relies, was drafted exclusively by Robert Gorman, McCormack's attorney, who testified that he drafted it without ever having talked with Potts' attorney or anyone else representing Potts. Therefore, this draft is of no probative value whatsoever as to Potts' intention. We also note that the great bulk of this pre-Agreement evidence dealt with the question of whether Potts or McCormack was going to pay the marine services providers directly, as opposed to the issue as to the correlation between Potts' marine services payment obligation and its throughput services payment obligation in the context of the final Agreement. Finally, the exchange of letters between Mr. Denise and Mr. Goos, on June 25, 1980 and August 25, 1980, respectively, sheds no

---

**4.** To the extent that the testimony of David C. Denise, McCormack's former president, at times suggests otherwise, we find such testimony to be wholly unconvincing.

**900**

light whatsoever on the present controversy because neither deals with the aforementioned marine services versus throughput services correlation.

█ McCormack also contends that, following the execution of the Agreement, Potts consistently made payments to McCormack greatly in excess of the amounts which Potts would have owed McCormack under Potts' interpretation of the Agreement. This, claims McCormack, constitutes substantial evidence that Potts agreed with McCormack's interpretation of the Agreement. According to this theory, Potts would not have made such excess payments otherwise because Potts was short of cash and because such substantial excess payments would be irrational for any business entity to make. By contrast, states McCormack, such payments were consistent with, and reasonable, under McCormack's interpretation of the Agreement.

It is undisputed that Potts made several "overpayments" to McCormack according to Potts' interpretation of the Agreement, and there is no need to describe each "overpayment." We find, however, that each of these overpayments except one (which will be discussed *infra*) was made only because McCormack commercially coerced Potts into doing so. Therefore, we find that these coerced overpayments are in no way reflective of Potts' interpretation of the Agreement. This coercion consisted of McCormack's refusing, and threatening to refuse, to load Potts' coal onto various ocean-going vessels until Potts paid to McCormack most or all of the amounts which McCormack demanded. McCormack's refusal to load could be devastating to Potts because Potts would be subject to large demurrage charges from the owners of those vessels if they were required to wait in port longer than anticipated. It is undisputed that a major reason why Potts made the Agreement with McCormack was to avoid, as much as possible, such costly demurrage charges through the Agreement's granting to Potts (and correspondingly the vessels chartered by Potts) the

exclusive use of the McCormack Terminal. Prior to the Agreement, Potts and many other coal exporters were required to pay very substantial demurrage charges because of the heavy backlog of vessels, and the resultant delays in their being loaded at the major ports on the Eastern seaboard.

A typical example of McCormack's coercion was its May 12, 1981 telex to Potts, which stated in part:

"As per our discussion today, we will wait for assignment of 325,000 dollars directly from Hanil Bank before we load out coal.... We will then proceed to load the barges.... It is imperative that this assignment be put in place if we are to hold to this schedule."

As mentioned *supra*, the only "overpayment' which was not coerced by McCormack was Potts' June 16, 1981 payment of $475,000.00. McCormack correctly states that, as of the date of and including this payment, Potts had paid a total of $975,-000.00, which was $225,000.00 in excess of the amount then due for the paragraph 6(a) and (b) payments. Therefore, claims McCormack, this $475,000.00 payment reflected Potts' understanding that it had to pay marine services charges on an ongoing basis in addition to the paragraph 6(a) and (b) payments because the total unloading, loading, and marine services charges were much less than $750,000.00 as of then. Thus, continues McCormack, Potts must have intended for the extra $225,000.00 to pay for marine services charges. However, Potts correctly points out that the excess $225,000.00 does not correlate to the amounts claimed by McCormack for marine services. Final arrangements for the June 16, 1981 payment had been completed by the parties on June 2, 1981. As of June 2, 1981, the total marine services charges billed by McCormack to Potts were $43,-547.50. Even as of June 16, 1981, when the payment was received, the total marine services charges were only approximately $98,800.00, and did not total $225,000.00 until July 6, 1981, more than one month after the aforementioned June 2, 1981 final payment arrangements. Furthermore, the

circumstances surrounding the June 16, 1981 payment militate against McCormack's contention. Prior to this payment, McCormack had expended approximately $1,500,000.00 in readying the Terminal for Potts' use. For various reasons, including devastating coal miners' and coal construction workers' strikes, Potts had virtually no source of funds for several months after the execution of the Agreement and fell behind on its initial payments due McCormack. McCormack desperately needed funds for labor and startup costs, having been deprived of the use of hundreds of thousands of dollars of Potts' money for several months. Therefore, Potts agreed to assign the additional $225,000.00 (out of a letter of credit totalling $2,455,695.00) to McCormack to help defray some of McCormack's expenses. Of course, Potts also knew that this $225,000.00 would be credited to its account. Also, Potts believed that it was spending this money wisely because it wanted the Terminal to be a success and envisioned a profitable, long-term Agreement. If McCormack could not perform its services effectively at the Terminal, the relationship between Potts and Potts' overseas customers could have been undermined to Potts' severe financial detriment. Therefore, under all of these circumstances, we conclude that the amount of the June 16, 1981 payment is of no weight in ascertaining Potts' contractual intent as to the Agreement.

█ In conjunction with the foregoing excess payments argument, McCormack contends that Potts implicity admitted that it agreed with McCormack's contract interpretation by failing to object to certain documents which were sent to Potts by McCormack and which were written in accordance with McCormack's interpretation of the Agreement. The document upon which McCormack most heavily relies is its July 7, 1981 telex to Potts, which states in its entirety:

TO:
FREDERIC A. POTTS AND COMPANY, INC.
POTTSVILLE, PA

FROM:
MCCORMACK TERMINAL COMPANY, INC.
SOUTH AMBOY, N.J.

JULY 7, 1981

ATTENTION: MR. KARL GOOS

RE: MARINE CHARGES AT SOUTH AMBOY TERMINAL

FOLLOWING IS A RECAP OF MARINE CHARGES INCURRED BY US FOR YOUR ACCOUNT:

| | |
|---|---|
| BARGE CHARTER TO 7/31 | 117,529.72 DLRS |
| BARGE INSURANCE TO 7/31 | 16,000.00 DLRS (ESTIMATE) |
| SANKO SUN | 137,250.51 DLRS |
| OGDEN CONGO | 127,852.27 DLRS |
| BARDU | 28,433.83 DLRS |
| PIERRE, L.D. | 45,000.00 DLRS (ESTIMATE) |
| PAN PACIFIC | 80,000.00 DLRS (ESTIMATE) |
| | 552,066.33 DLRS |
| RECEIVED ON ACCOUNT | 225,000.00 DLRS |
| BALANCE DUE | 327,066.33 DLRS |

WE WILL REQUIRE YOU TO IRREVOCABLY AND UNCONDITIONALLY ASSIGN TO US 327,000.00 DLRS OUT OF THE FIRST PROCEEDS RECEIVED BY THE PAYING BANK UNDER THE LETTER OF CREDIT ISSUED FOR THE SHIPMENT ABOURD (sic) THE PAN PACIFIC, WHICH WE UNDERSTAND IS DUE ON JULY 9TH.

PLEASE ISSUE APPROPRIATE INSTRUCTIONS TO THE FIRST NATIONAL BANK OF WILMINGTON, CONSISTENT WITH THE FOREGOING. WHEN WE HAVE RECEIVED CONFIRMATION FROM THE FIRST NATIONAL BANK OF WILMINGTON OF THESE INSTRUCTIONS WE WILL COMMENCE LOADING THE PAN PACIFIC

REGARDS,

MCCORMACK TERMINAL COMPANY, INC.

DAVID C. DENISE, PRESIDENT

McCormack claims that its calculation of the $225,000.00 received on account and the $327,066.33 balance due is consistent only with its interpretation of the Agreement and is inconsistent with Potts' interpretation. Therefore, argues McCormack, Potts' failure to object to the principles underlying McCormack's calculations is an implicit admission that Potts agreed with McCormack's interpretation of the Agreement and constitutes compelling evidence of the parties' contractual intent. We agree that Potts did not specifically object to this telex in terms of the precise contract interpretation issue before us. However, a review of some of Mr. Goos' testimony is instructive on this matter:

Q. So based on your experience and your expertise, when you got this telex, you thought McCormack was incur-

ring or at least was charging you too much for marine services.

A. I thought somebody jumped off the board, yes.

(Notes of Testimony, page 1698)

Q. But did you agree with that?

A. No, I did not agree with anything. They claimed these were their marine charges. They characterized those charges as marine charges. And if you take the first two vessels and calculate what those should have been per ton, my God, you could have put it in with a pick and shovel on the boat and it would have been cheaper.

Q. But you knew that these were marine charges as opposed to throughput charges when you got the telex.

A. It says on the telex. I didn't agree whether they were marine charges or no charges. All I remember is that when I got this letter, I was outraged. I called for a meeting to straighten out and settle these matters.

Q. You saw it said, "Received on account $225,000." Is that correct?

A. That's what it says.

Q. Did you know what that was for?

A. That must have been their interpretation for payments that we made. I don't know whether, without looking at your chart, whether we at one time paid $225,000 sum or whether they concluded that part of the payments we made was for marine charges and some was for others. Most of it were advances. I don't know. There is no $225,000 that was paid at one time that I could easily identify as received on account....

(Notes of Testimony, pages 1699–1700).

Q. Did you ever at the meeting on July 9 ask anyone—Mr. Denise or Mr. Golomb? [5]

A. It was agreed that Mr. Golomb and Mr. Oesterle [6] would try to figure out the differences. There would be a meeting that would follow this particular meeting because neither of them did have all their records with them....

Q. Just answer my question, Mr. Goos. At the meeting of July 9, did you ask anyone what this $225,000 was for?

A. I'm sure I asked a lot of questions about these numbers. I don't recall specifically whether I asked anyone specifically to explain to me what they mean by having received on account $225,000, because I did not do the bookkeeping.

(Notes of Testimony, pages 1700–1701).

At the July 9, 1981 meeting, which was convened pursuant to the July 7, 1981 telex, Mr. Goos explained why he agreed to pay $300,000.00 of the demanded $327,-066.33:

Q. Were you not by this payment of $300,000, Mr. Goos, paying in substance the amount that McCormack claimed was due in the telex of July 7, Exhibit 490?

A. I don't think so.

Q. Then why did you pay $300,000 and for what purpose?

A. Well, I believe the $300,000 was agreed until such time when the accountants would be able to reconcile their differences....

Q. Did you intend that any portion of the $300,000 paid out of this letter of credit would be for the marine charges incurred on the Pan Pacific?

A. Mr. Baylson, I don't remember what I intended at that time. As far as allocating part of this money to the marine charges for the Pan Pacific, the ship was in the port. We were told, unless you pay $300,000, we are not going to load it. And we would have incurred substantial demurrage charges, and we had no choice but to load this ship, no matter how long it would take us to battle this disagreement out with McCormack, because

---

**5.** Sherman Golomb was McCormack's accountant.

**6.** Hans Oesterle was Potts' treasurer.

the ship of an innocent third party was sitting in there, and we had to load it. (Notes of Testimony, pages 1715–1716).

We have quoted the testimony of Mr. Goos, which we find completely credible, at some length in order to show the circumstances surrounding his receipt of the July 7, 1981 telex and his reaction thereto. Also, although not expressly stated in the particular testimony quoted, we find, as Mr. Goos was well aware, that McCormack's invoicing system was unreliable, untimely, and far below generally accepted commercial standards. Therefore, we cannot blame Mr. Goos for being more concerned with the highly questionable invoicing system and apparently inflated marine services charges, not to mention the urgent need to load the ship waiting in harbor, than with a potential contract interpretation issue that was muddled by McCormack's shoddy accounting practices. The issue was only potential because Mr. Goos expected, and had every right to expect, that the contracted relationship between Potts and McCormack would last for at least the five year term of the Agreement and that any payments made by Potts would be credited to its account on an ongoing basis. Also, of course, the present controversy would not even exist except on a less than annual accounting, given the aforementioned annual reconciliation under paragraph 6(c)(iv) of the Agreement.

Based upon the foregoing circumstances, along with Mr. Goos' credible and convincing testimony, we conclude that Mr. Goos' failure to object specifically to the contract interpretation manifested by McCormack's July 7, 1981 telex is entitled to minimal weight only in our determination of the present controversy.[7]

McCormack also argues that Potts' obligation to pay marine services charges on an ongoing basis is consistent with the relative financial obligations of the parties. However, this argument is basically a repetition of an argument it has already made, *supra*, with regard strictly to the language of the Agreement itself. It is the contention pertaining to the annual reconciliation under paragraph 6(c)(iv), whereby McCormack argues that if marine services charges are to be paid in addition to throughput charges on an annual basis, they should also be payable separately and in addition to throughput charges on an ongoing (less than annual) basis. We are likewise still aware that, under certain scenarios, Potts would, in effect, not be paying for some or all of the marine services charges until the paragraph 6(c)(iv) annual reconciliation, even though McCormack might have been paying the marine services providers directly on an ongoing basis. We carefully considered this argument earlier in interpreting the language of the Agreement and need not do so again under the separate guise of extrinsic evidence.[8] Also, McCormack failed to establish a factually meaningful predicate for considering this argument in terms of extrinsic evidence because it only recited some of its expenses during the course of the Agreement (Potts also had business expenses) and indicated that it, like all businesses, would rather be paid sooner than later. Therefore, we conclude that this argument does not further our quest for the parties' contractual intent.

Potts advances one major argument of its own with respect to the extrinsic evidence. It points to the undisputed fact that Robert Gorman, McCormack's counsel, drafted the final Agreement, and did so without any discussions, let alone full nego-

7. For similar reasons, we conclude likewise as to the other similar documents alluded to by McCormack. The Coopers and Lybrand report (*See* plaintiff's exhibits 1210, 1212), however, is in a different category because it was not prepared by McCormack. It is, however, of minimal probative value on the same basis.

8. We note, however, because McCormack phrases this argument in terms of the relative financial obligations of the parties, that Potts obligated itself through the Agreement to pay $250,-000.00 per month to McCormack for five years with no assurance that the execution of the Agreement signalled a successful business venture for Potts. In fact, for various reasons, it was unsuccessful.

tiations, with Potts' counsel or anyone else on Potts' behalf. It also points to the fact that the language of the Agreement has been determined to be ambiguous. The black-letter law in New Jersey, as elsewhere, is that ambiguous contract language is construed against the drafter. *Matter of Community Medical Center,* 623 F.2d 864, 866 (3rd Cir.1980); *Bullowa v. Thermoid Co.,* 114 N.J.L. 205, 215, 176 A. 596, 602 (1935). The Official Comment to Section 206 of Restatement (Second) of Contracts states in part:

> "[w]here one party chooses the terms of the contract, he is likely to provide more carefully for the protection of his own interests than for the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party."

Therefore, Potts contends that McCormack's having drafted the Agreement is a strong factor in favor of Potts' interpretation of the Agreement. We agree with Potts to a certain extent. However, the importance of this factor is diminished somewhat because it appears from the record that Potts' counsel primarily drafted the December 19, 1980 draft of the Agreement upon which the final Agreement was largely based.

In summary, we conclude that all of the aforementioned extrinsic evidence of the parties' contractual intent, carefully considered both individually and as a whole, is fundamentally inconclusive. To the extent that any of this evidence is of limited probative value, it pales in significance in comparison with the language and structure of the Agreement itself, which, we repeat, strongly favors Potts' interpretation of the Agreement. Therefore, we hold that Potts was not required to pay for marine services charges independently of its payment obligations under paragraph 6 of the Agreement. We correspondingly hold that Potts was not in default of the Agreement as of August 19, 1981 or at any time thereafter. Rather, McCormack's termination of the Agreement on September 8, 1981 and refusal to perform pursuant to the Agreement thereafter was an anticipatory repudiation of the Agreement and constituted a material breach of the Agreement. We shall, therefore, enter an Order denying in its entirety all of the relief requested against Potts by McCormack in its complaint.