### INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 571, Plaintiff,

v.

### HAWKINS CONSTRUCTION CO., Defendant.

### INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 571, Plaintiff,

v.

### KIEWIT WESTERN COMPANY, Defendant.

Nos. 88–0–556, 88–0–557.

United States District Court, D. Nebraska.

Jan. 3, 1990.

---

Weinberg & Weinberg, M.H. Weinberg Omaha, Neb., for plaintiff.

Malcolm D. Young, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

### I. INTRODUCTION

RICHARD E. ROBINSON, Senior District Judge.

This is a breach of contract action involving a collective bargaining agreement be-tween the plaintiff, the International Union of Operating Engineers Local 571 ("Union"), and the Heavy Contractors Association ("HCA"), a multiemployer bargaining unit to which the two defendants, Hawkins and Kiewit Western, belonged at the time the agreement was first put into effect. The action is brought pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. The Union is a labor organization which represents employees in an industry affecting commerce; both defendants are corporations engaged in the construction industry, and both are employers as defined in Sec. 1 et seq. of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*

Specifically at issue is the construction of two phrases in an amendment to the contract in question. The Union contends that the amendment had the effects of (1) extending the contract for as long as it would take to complete the designated projects, and (2) of giving the Union the authority to demand that Kiewit and Hawkins withhold a designated amount from the wages of union employees to be turned over to the Union as dues, a process known as an "administrative checkoff."

Kiewit Western and Hawkins disagree with the Union's interpretation. They argue that (1) the language in question was intended only to amend an existing contract, and had no effect on the contract's existing termination date, and (2) that the language did not, and was not meant to, encompass an administrative dues check-off.

The Court, for reasons explained in detail below, agrees with defendants Kiewit Western and Hawkins that the amendment did not provide for imposition of an administrative dues checkoff, and therefore finds for defendants. Because this finding makes the termination date of the contract irrelevant for purposes of this action, the Court need not, and will not, resolve that issue.

This Memorandum Opinion constitutes the Court's finding of fact and conclusions

of law as required by Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT

### A. THE AMENDMENT

On April 1, 1986 the Union and the HCA entered into a collective bargaining agreement, in effect until April 1, 1988. Plaintiff's Exhibit 1. That agreement set wage and benefit rates for the period covered, but did not provide for any form of dues checkoff. *Id.*

On November 12, 1987, following a series of meetings, the Union and HCA entered into an agreement amending the collective bargaining agreement. Plaintiff's Exhibit 2. The amendment, in its entirety, reads as follows:

> This AGREEMENT between the Operating Engineers Local 571 and the Heavy Contractors Association consists of the following terms:
>
> 1. The Davis–Bacon rates incorporated into the project contract documents for the State of Nebraska Bid Lettings for November, 1987, and December, 1987, for those projects bid within our contract territory, *shall apply for the life of the project.*
> 2. Local 571 may adjust the *fringes and wages within the predetermined wage package* to the extent permitted by law and agreed to by HCA. The adjustment shall not exceed the total dollars set out in the predetermined package.

(Emphasis added). The amendment was signed for the Union by George Brown, Region 6 International Representative of the International Union of Operating Engineers, at the direction of I.U.O.E. Regional Director Jerry Sunboom, and for the HCA by Malcolm D. Young, Executive Secretary of the HCA. Also present at the November 12 meeting were James Timmins, business manager and financial secretary for Local 571, Willis Epstein, executive vice president of Hawkins, Kim Hawkins, general counsel and treasurer for Hawkins, and Curt Andersen of Vrana Construction Company.

The Davis–Bacon rates to which the amendment refers are set by the United States Department of Labor per the Davis–Bacon Act, 40 U.S.C. Secs. 276a *et seq.* They are the minimum rates to be paid to the various classes of mechanics and laborers employed on a project under federal contract for an amount in excess of $2,000. The rates are intended to reflect the prevailing rates for such jobs in a particular locality. The rates are applicable to projects by the State of Nebraska involving federal funds.

The Davis–Bacon rates are a minimum rate, and higher wage and benefit packages may be, and often are, negotiated by the contractors and union employees. This discrepancy had become especially acute in Nebraska, where the established Davis–Bacon rates were some $2.25 per hour lower than the rates provided for in the 1986–1988 Agreement between the Union and the HCA. Testimony of Willis Epstein, executive vice-president for Hawkins Construction, Tr. at 74. Because other, non-union, contractors could, and had, bid for projects at the minimum rate and thereby considerably underbid the HCA for projects involving federal funds, *id.* at 78, both the Union and the HCA had an incentive to raise the Davis–Bacon rates.

That incentive increased as the HCA prepared to bid on the November and December 1987 bid lettings by the State of Nebraska Department of Roads. In order to avoid the possibility of being underbid by non-union, non-HCA contractors, the Union and the HCA began a series of meetings with the dual purposes of (1) incorporating those rates into the existing collective bargaining agreement, thus allowing the HCA to bid at the same rate as the other contractors, and (2) coordinating efforts to raise the Davis–Bacon rates to reflect, as nearly as possible, the existing agreement rates. The November 12, 1987 amendment was the result of those meetings.

### B. SUBSEQUENT DEVELOPMENTS

The State of Nebraska, in a document issued November 12, 1987 and dated November 13, 1987, modified the applicable

wage and fringe benefit rates upward $2.25 per hour, making them equivalent to the rates that had been set in the original 1986–1988 agreement between the HCA and the Union.

Kiewit Western and Hawkins subsequently bid on the State of Nebraska Department of Roads projects, predicating their bids on the amended agreement. Kiewit Western was awarded two bids, known as the "Cornhusker Road" project and the "Vinton Street" project; Hawkins was also awarded two bids, the "Ashland Bridge" project and the "144th Street Tunnel" project. *Pretrial Order* at 5.

On November 30, 1987 Hawkins resigned from the HCA, and the Union was notified of that resignation. *Id.* On December 10, 1987, Kiewit Western also resigned from the HCA; the Union was notified on December 14, 1987. Id. at 6. Both Kiewit Western and Hawkins acknowledged that they would continue to honor the 1986–1988 agreement until its April 1, 1988 expiration. Defendant's Exhibit 1 (Kiewit Western); Defendant's Exhibit 2 (Hawkins). During the duration of the agreement both Kiewit Western and Hawkins paid the full wage and fringe package set forth in the agreement, *Pre-trial Order* at 6, and the package never varied. *Id.* at 7. Prior to and after the expiration of that agreement, the Union negotiated for new collective bargaining agreements, separate from the HCA, with both Kiewit Western and Hawkins, *Pretrial Order* at 6, although no new agreements were reached.

On July 20, 1988 the Union and the HCA, *sans* Kiewit Western and Hawkins, entered into a new collective bargaining agreement that, *inter alia*, expressly provided for an administrative dues checkoff. *Pretrial Order* at 6. At that time the Union demanded that Kiewit Western and Hawkins also institute a checkoff. Both refused, resulting in the instant litigation.

### III.  CONCLUSIONS OF LAW

### A.  MOTION FOR DISMISSAL

■ At the conclusion of the Union's case-in-chief, defendants moved for a dismissal, arguing that the Union had "failed to prove any cause of action against the defendants and prove any contract under which these defendants would be required to make a checkoff of their employees for payment to 571." Transcript at 62.

The Court reserved ruling on the motion, and defendants proceeded to proceed with their case. Such an action constitutes waiver of the motion. *See Duval v. Midwest Auto City, Inc.,* 578 F.2d 721, 724 (8th Cir.1978):

> If a defendant, after moving for involuntary dismissal at the close of the plaintiff's case, introduces evidence on his own behalf, his right to a judgment of dismissal is thereby waived.... This conclusion is not altered by the fact that the trial judge reserved ruling on the motion when made.... If defendants wished to challenge this decision, their avenue for doing so was to refuse to offer their evidence, accept a judgment ·for plaintiffs, and appeal it on the ground that plaintiffs' evidence was insufficient.

(Citations omitted). *See also* 5 *Moore's Federal Practice,* Para. 41.13, n. 16 (1989): "The trial court's reservation on its ruling ... is in effect a denial. Defendant may appeal directly from the order; or, if he proceeds with his case, he waives any objection to the trial court's denial...."

Because the defendants proceeded, following the Court's reservation of ruling, to introduce evidence on their own behalf, the Court will treat their motion as having been waived.

### B.  "FRINGES AND WAGES" DOES NOT INCLUDE AN ADMINISTRATIVE DUES CHECKOFF.

1. "Fringes and Wages" is not reasonably susceptible to a reading that includes an administrative dues checkoff.

■ The Union argues that the phrase "fringes and wages" can be read to include an administrative dues checkoff, and such a reading was, in fact, the intent of the parties. Defendants argue that a dues checkoff is not, and has not traditionally been considered, a form of fringe benefit.

The Court finds strong support for defendants' position. Examination of standard definitions of both terms, statutory analysis, and analogous case law indicate that the two are conceptually distinct:

### (a) STANDARD DEFINITIONS

*Roberts Dictionary of Industrial Relations* (3d Ed.1986) defines fringe benefits as "nonwage benefits or payments *received by workers*. They include such items as vacation pay, paid sick leave, paid holidays and insurance benefits." (emphasis added). *Roberts* defines a check-off as "[a] procedure by which the employer *deducts from the pay of all employees* who are members of the union in the bargaining unit, membership dues and assessments and *turns these monies over to the union*" (emphasis added).

Thus it can be seen the two terms deal with different concepts. A "fringe benefit" is paid to the employee, and is other than wages; money funneled into a "check-off" goes to the union, and is deducted from a employee's paycheck.

*See also Black's Law Dictionary* (Abridged 5th Ed.1983): "**Check-off system** Procedure whereby employer deducts union dues *directly from the pay of employees and remits such sums directly to the union*"; "**Fringe benefits.** Side nonwage benefits which accompany or are in addition to a person's employment.... Such benefits are *in addition to regular salary or wages* and are a matter of bargaining in union contracts." (emphasis added).

### (b) STATUTORY CONSTRUCTION OF THE APPLICABLE PROVISIONS OF THE DAVIS–BACON ACT (40 U.S.C. § 276a).

As noted above, the amendments were negotiated in the context of the Davis–Bacon rates, with the intent of raising those rates to reflect the higher wage and benefit packages that had been paid over the two years since the rate was last adjusted. Accordingly, it is appropriate, in determining the meaning of the phrase "fringe benefits", to look to construction of that phrase in the context of Davis–Bacon. That phrase has been explained by the Department of Labor at 29 CFR Sec. 5.29 (July 1989):

(a) The [Davis–Bacon] act lists all types of fringe benefits which the Congress considered to be common in the construction industry as a whole. *These include the following: Medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, unemployment benefits, life insurance, disability and sickness insurance, or accident insurance, vacation and holiday pay, defrayment of apprenticeship or other similar programs, or other bona fide fringe benefits....* (Emphasis added).

Because an administrative dues check-off is not expressly listed in the Act, it must be categorized as an "other bona fide fringe benefit" in order to come within the scope of the Act. But closer scrutiny indicates that the range of the latter phrase is not that broad. As the Department of Labor Regulations continue:

(c) The term 'other bona fide fringe benefits' is the so-called 'open end' provision. This was included so that new fringe benefits may be recognized by the Secretary as they become prevailing....

(d) .... While each situation must be separately considered, payments made for travel, subsistence or to industry promotion funds are not normally payments for fringe benefits under the Act. The omission in the Act of any express reference to these payments, which are common in the construction industry, suggests that these payments should not normally be regarded as bona fide fringe benefits under the Act.

*Id.* There has been no evidence that an administrative dues checkoff has become a prevailing "new fringe benefit" that should be recognized by the Secretary of Labor. Moreover, it should be noted that the one item mentioned above that most arguably resembles a union check-off, that of "industry promotion funds", is specifically determined by the Department of Labor *not* to be a fringe benefit.

### (c) ANALOGOUS CASE LAW

In *Trinity Services Inc. v. Marshall*, 593 F.2d 1250 (D.C.Cir.1978), the Court was faced with interpretation of the fringe benefits clause of the Service Contract Act, 41 U.S.C. Sec. 351(a), an Act that parallels the intent and effect of the Davis–Bacon Act, but in the area of service providers rather than construction contracts. In determining that a severance pay clause was *not* a fringe benefit, the Court made the following analysis:

*All of the examples of fringe benefits in section 351(a)(2) [the Service Contract Act, identical in this aspect to Davis–Bacon] require the employer who extends such a benefit to his employees to incur a present cost or the risk of a future cost.* That is, to provide the benefit, the employer must make a payment to the employee (or to a fund maintained in the employee's behalf) for the present or future use of the employee (or his beneficiary), allow the employee to accrue some form of deferred compensation (such as vacation time), or incur the risk of granting the benefit to the employee (or his beneficiary) at some future time (such as compensation for injuries or illness from occupational activity). Many examples of benefits can be imagined which involve a present cost or the present risk of a future cost to the employer of the workers. *These are 'bona fide fringe benefits.'*

It is a well-settled principle of statutory construction that where specific words precede or follow general words in an enumeration describing a particular subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words. If [the requirement that a successor corporation make severance payments if it did not hire incumbent's work force] were considered an 'other bona fide fringe benefit', then the interpretive principle of *ejusdem generis* would be violated and the statute construed contrarily to its apparent meaning. *Id.* at 1257–58 (emphasis added, citations omitted).

The Court today adopts the same line of analysis, and finds that an administrative dues check-off, a reduction of an employee's wages that is transmitted to the Union, is not in the same context as a fringe benefit, which involves payment to the employee or to a fund maintained on his behalf.

### 2. In this case, the language need not be construed against the draftsman.

■ The Union has argued that the language of this contract should be construed in its favor, because the contract was drafted by defendants. This proposition is generally supported by case law, *see e.g. United States v. Seckinger*, 397 U.S. 203, 210, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970) (noting the "general maxim that a contract should be construed most strongly against the drafter") and the commentators, *see Restatement (Second) of Contracts*, Sec. 206 (1981) (stating that "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, the meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds").

There are, however, exceptions to the rule. As defendants have observed, the cases cited by the Union involve insurance or other adhesion-type contracts, presented to the non-drafting party on a take-it-or-leave-it basis. By contrast, the agreement in question in the instant case was jointly negotiated by both parties.

Moreover, the policy of construction against the drafting party "has less force when the other party has taken an active role in the drafting process, or is particularly knowledgeable." *Restatement (Second) of Contracts*, Sec. 206, *Reporter's Note* (1981). The focus of the rule is not so much on who produces the final draft of a document, but rather on the roles played by the various parties involved in the drafting. Cf. *In re F.A. Potts & Co.*, 70 B.R. 894 (Bkrtcy.E.D.Pa.1987) (holding that the effect of the rule was "diminished because.... [the non-drafting party's] counsel primarily drafted the ... draft upon

which the final Agreement was based."). Although neither of the Union's negotiators were lawyers, neither are the terms in question such that any particular legal expertise would be required. Both Union representatives had considerable labor experience: Mr. Timmins had been employed by the Union for some nine years, serving as business manager and financial secretary, and previously as business agent and president; Mr. Brown was International Representative for Region 6 of the International Union of Operating Engineers, a region encompassing some six states. Both freely and openly participated in the negotiations leading up to the final document. There has been no showing that they needed or were entitled to special consideration.

Moreover, "[a] prerequisite of [the] rule is that the alternative interpretation placed upon the alleged ambiguity by the [non-drafting party] be, under all circumstances, a reasonable and practical one," *Gelco Builders & Burjay Const. Co. v. United States*, 369 F.2d 992, 999–1000, 177 Ct.Cl. 1025 (1966); *Reporter's Note, Restatement (Second) of Contracts*, Sec. 206 (1981) ("as the text of the section makes clear, the rule does not apply if the non-drafting party's interpretation is unreasonable"). As the Court has explained above, it is simply not reasonable to read the phrase "wages and fringe benefits" as encompassing an administrative dues checkoff.

3. Because the court finds no ambiguity with regard to the scope of the phrase "Fringes and Wages", the court may not consider extrinsic evidence as to any purported intent to allow the Union to demand an administrative checkoff.

■ The Court's finding that "fringes and wages" does not encompass an administrative dues checkoff necessarily precludes the Court, by operation of the parol evidence rule, from considering any evidence that the parties' intent was other than that manifested by the written amendment. "Under the parol evidence rule, extrinsic evidence is inadmissible to vary, contradict or add to a written contract which is unambiguous", *United States Through the Small Business Administration v. White*, 766 F.2d 394, 396 (8th Cir.1985).

■ The parol evidence rule applies to collective bargaining agreements. *See, Mohr v. Metro East Manufacturing Co.*, 711 F.2d 69, 72 (7th Cir.1983) (Posner, J.): "The initial question is whether there should be any parol evidence rule for collective bargaining agreements, but we agree with the sparse authority on the point that there should be."

The question therefore becomes whether the contract is ambiguous with regard to the term in question. "A contract is ambiguous if reasonably susceptible of more than one construction, and the question of whether an ambiguity exists is a matter of law for the court". *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 386 (8th Cir. 1969); *Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660, 664 (8th Cir. 1981). "Moreover, a mere difference of opinion as to the proper interpretation does not render the contract ambiguous as a matter of law." *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784 (8th Cir.1984).

Having found that the proffered alternative construction is not reasonable, the Court finds no ambiguity, and therefore the Court will not go beyond the four corners of the document to determine its meaning. *See, e.g. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. Sundstrand Corp.*, 650 F.Supp. 83 (N.D.Ill.1986) (refusing to consider other evidence where provision in collective bargaining agreement is "clear and not susceptible to other meanings").

## IV.  CONCLUSION

After careful consideration, the Court finds that the amended 1986–1988 collective bargaining agreement between the Union and the HCA, the only contract binding upon Kiewit Western and Hawkins, did not provide for an administrative dues checkoff. Accordingly, the Court concludes that the defendants' refusal to accede to the Union's demand for implementation of such a checkoff is not a breach of that agree-

ment. An appropriate Order and Judgment will be entered in conformity with this Memorandum Opinion.